UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 DEC -6  A 10: 27

02-3582

SECT. N MAG. 1

BERNELL JULUKE, JR.                    *
                                       •    C.A. No.
vs.                                    *
                                       *    Section " ",  Mag.
BURL CAIN, Warden                      *
Louisiana State Penitentiary at Angola *
* * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF
## COMPLAINT FOR FEDERAL HABEAS CORPUS RELIEF

MAY IT PLEASE THE COURT:

### BACKGROUND

This is a habeas corpus proceeding brought on behalf of a person in custody pursuant to the

judgment of a State court.  Petitioner, Mr. Bernell Juluke, Jr., was indicted on October 20, 1994,

along with two co-defendants in Criminal District Court for Orleans Parish, Louisiana for the First

Degree Murder of Rondell Santinac during the perpetration of a drive by shooting.[1]  Mr. Santinac

was shot in the head while occupying the front passenger seat of a 1982 Chevrolet Chevette vehicle

in the Desire Housing Project on the evening of August 22, 1994.

The three defendants named in the indictment were Kunta Gable, Bernell Juluke, and Leroy

Nelson.  All three defendants were arrested while occupying a grey car in another part of the city on

the night of the shooting.  No guns, bullets, or other physical evidence were found in the car

occupied by defendants.  None of the defendants testified at trial. All were convicted of second

degree murder,  which in Louisiana carries a mandatory life sentence, with no right to parole or

probation.  The District Attorney's Screening Action Form contained in the court record indicates

_____

[1] Indictment, Record, Vol. 1, p.1.

_____ Fee_____
_____ Process_____
__X_ Dktd _Coo____
__V_ CtRmDep_____
_ _  Doc. No.___3_____

that Mr. Juluke's birthday is July 17, 1976, which would have made him just over 18 years of age on the date of his arrest.

Former New Orleans Fifth District Police Officers Len Davis and Sammie Williams were credited with being the first officers at the murder scene. They did not testify at Mr. Juluke's trial or any pre-trial hearings apparently because the State was apparently unwilling to call them as witnesses in view of their federal indictments. A few months after Santinac's murder, Officers Davis and Williams were arrested, and later convicted, on federal charges.[2] The initial police report of the Santinac murder was prepared by Officers Davis and Williams and recites that there were three perpetrators. It lists the perpetrators' names and addresses as "unknown." The Davis-Williams police report further contains the abbreviation "unk," presumably standing for "unknown," in the

---

[2] This court can take judicial notice of the fact that in a series of highly publicized federal cases, See, e.g. *U.S. v. Causey*, 185 F.3d 407 (C.A.5 (La.) 1999), New Orleans Police Department Officers Len Davis and Sammie Williams were found to have been involved in the execution-style murder of Kim Marie Groves. These officers targeted Groves because she filed a complaint against Davis with the Internal Affairs Division of the NOPD alleging that he engaged in police brutality. Davis had a relationship with Hardy, a New Orleans drug dealer, in which Davis exchanged police protection for favors. Davis recruited Hardy and Hardy's associate Causey to kill Groves. Davis, Hardy and Causey planned the murder <u>and subsequent coverup</u>. Hardy was the triggerman who killed Groves. Official knowledge of Davis' and Williams' involvement in the murder arose during an FBI sting operation aimed at rooting out NOPD corruption. As observed by the U.S. Fifth Circuit in *U.S. v. Duncan*, 191 F.3d 569, 572 (C.A.5 (La.) 1999): "In late 1993, a New Orleans crack cocaine dealer, Terry Adams, wearied of extortion by Police Officer Sammie Williams, complained to the Federal Bureau of Investigation and agreed to assist their investigation. Williams quickly accepted Adams' request for paid protection for his drug-dealing activities and volunteered the services of fellow officer Len Davis. [For] several months, . . . Williams and Davis guarded what they believed to be cocaine shipments at a warehouse, . . . . " After Davis and Williams, together with nine other NOPD officers and one Levee Board Reserve Officer, were arrested in the FBI drug ring sting operation, Davis and his co-defendants were indicted on December 2, 1994 for the murder. Thus, the prosecution of former NOPD Officers Davis and Williams proceeded almost simultaneously with the prosecution of Bernell Juluke and his co-defendants for Santinac's murder, which was begun by indictment on December 20, 1994.

block form spaces calling for physical and clothing descriptions of the perpetrators. As these officers have been demonstrated to be capable of planning murders and cover-ups of murders, any murder case in which they are involved should be closely examined for their possible participation.

Avoiding any reference during the pre-trial and trial proceedings to the Davis-Williams report, which indicated that the perpetrators were unknown, the State contended at trial that there was, indeed, one (1) eye-witness, Mr. Samuel Raiford, who just one month prior to Mr. Juluke's trial had himself pled guilty to attempted murder,[3] but was not serving any jail time at the time of Mr. Juluke's trial, and who purportedly gave information to police at the scene of the murder that led to defendants' arrest. The key points of Mr. Raiford's testimony at trial, however, are that he eventually admitted, late in trial, that he did not see the driver of the vehicle during the shooting,[4] and that he did not see the color of the car involved in the shooting.[5] That testimony, coupled with Mr. Raiford's earlier testimony at the pre-trial motion hearing about only thinking that the driver was Bernell Juluke, raises serious doubt about the substance of what Mr. Raiford told officers at the scene of the murder.[6]

---

[3] Trial Transcript (2/27/96), p. 78.

[4] Trial Transcript 2/27/96 p. 80 (Raiford).

[5] Trial Transcript 2/27/96, p. 86 ("I didn't see the color.")

[6] See, Transcript of 6/30/95, p. 3-4, *Wade* hearing, at which Raiford testified as follows under questioning by Assistant District Attorney, Karen Carter:

Q. The car that drove by, do you remember what type of car it was? A. Yeah, it was like a turquoise green Baretta?
Q. Did you recognize anyone in that Baretta? A. Yeah.
Q. And who did you recognize? A. That was them.
Q. Who is "them?" A. Bernell, Kunta and Sidney?
Q. Okay, are they present today? A. Huh?

Mr. Raiford's admission late in the trial that he did not actually see the driver of the car during the shooting, or the color of the car, raises serious constitutional issues, especially as to Mr. Juluke, in view of the fact that such admission followed police testimony and repeated references during trial to Mr. Raiford's "identification" of Mr. Juluke at police headquarters.

That identification testimony was the subject of a pre-trial hearing at which Mr. Juluke was unrepresented, as his appointed counsel, Mr. Wade Kee, was absent. In this case, defendant Kunta Gable had retained Mr. Joseph Rome as his trial counsel. Mr. Nelson and Mr. Juluke were initially both represented by the Orleans Indigent Defender's Office, as appointed counsel.[7] However, on or about January 27, 1995, the Court appointed Mr. Kee to separately represent Mr. Juluke.[8]

A hearing on Motions to Suppress Statements and to Suppress Identifications was begun on April 7, 1995 before the Honorable Patrick G. Quinlan. Further testimony was taken on June 2, 1995,[9] and the pre-trial motion hearings were concluded on June 30, 1995, over four months after the filing of the Motion to Suppress the Identification. On September 18, 1995, all three defendants,

---

Q.    Are they present today in court? A.   Yeah.
Q.    Where are they? A.   Right there (indicating).
Q.    Who was the driver of the car?
A.    I think it was Bernell.

[7] Minute entries, Oct. 25, Nov. 4, 1994, Rec. Vol. 1, pp. 14, 15.

[8] Minute entry, Jan. 27, 1995, Rec. Vol. 1, p. 19.

[9] The docket master entry is confusing as to what occurred on June 2, 1995, but the supplemental transcript of the June 2, 1995 proceedings suggest that the June 2, 1995 proceedings were a continuation of testimony earlier taken with respect to the Motion to Suppress identification. Apparently, Detective Wayne Tamborella was not available when the hearing was begun on an earlier date, and so his testimony was taken on June 2, 1995.

acting in *propria persona*, filed identical handwritten writ applications[10] with the intermediate Louisiana appellate court, complaining of the delay in obtaining a hearing on their Motion to Suppress Identification ("MOSI"), and requesting that the court grant them a speedy trial. The writ applications advised the Court of Appeal that the proceedings were being repeatedly delayed because of the "uncertainty regarding a proper and accurate identification" by "the supposed witness, Samuel Raiford."

It is significant to this appeal that Mr. Juluke's attorney, Mr. Kee, was not present during the June 30, 1995 proceedings. The trial court refused to suppress the identification of the perpetrators by Mr. Raiford and additionally refused to suppress the arresting officer's testimony that Mr. Juluke "changed" the name he gave to Officer Felix when he was interviewed at the scene of the arrest as a result, supposedly, of Mr. Juluke hearing a police broadcast during the officer's conversation with Mr. Juluke.

After trial and conviction of all three defendants, Mr. Juluke argued in his direct appeal that his trial counsel should have requested a mistrial upon Mr. Raiford's admission that he did not see the driver of the car from which shots were fired because (1) such admission proves the suggestiveness of Mr. Raiford's station house "identification" of Mr. Juluke as the driver, and (2) because such admission only came after earlier and repeated testimony about Mr. Raiford's station

---

[10] No. 95-K-2055 (La. App. 4th Cir. (10/5/95),(Hons. William H. Byrnes, III, Philip C. Ciaccio, Patricia Rivet Murray, Judges presiding), *In re Kunta Gable, Bernell Juluke and Leroy Nelson,* applying for Supervisory Writs directed to Hon. Patrick G. Quinlan, Judge, Section B, #372-656, Criminal District Court Orleans Parish, stating: "Writ granted for the sole purpose of transferring relators' writ to the trial court to be filed as a motion for speedy trial. The trial court is ordered to consider relators' motion for speedy trial within thirty days of this order. The trial court is further ordered to furnish this Court with proof of compliance." See State Appeal Record p. 160-164.

house "identification" of Mr. Juluke, as well as following the introduction of multiple layers of hearsay in the form of testimony about a police radio communication, which was postured as communicating Mr. Raiford's statement identifying Mr. Juluke as a perpetrator.

A jury rendered a verdict on March 1, 1996 convicting Mr. Juluke of second degree murder, apparently convinced that Mr. Juluke was the driver of a vehicle involved in a drive-by shooting committed by co-defendants. The jury also convicted Messrs. Gable and Nelson, the alleged shooters, of second degree murder.

The case has a long and significant procedural history. On direct appeal, the state intermediate appellate court reversed Mr. Juluke's conviction for insufficiency of evidence, pretermitting consideration of Mr. Juluke's other assignments of errors, including the absence of counsel. It also affirmed the conviction of the two co-defendants. *State v. Kunta Gable, Bernell Juluke, Jr. and Leroy Nelson*, Slip Opinion, No. 99-KA-1920 (4th Cir. 1/21/98).

However, the Louisiana Supreme Court granted the prosecution's application for writ of certiorari and reversed the appeals court. *State of Louisiana v. Juluke*, 725 So.2d 1291 (La. 01/08/99). In doing so, it held -- without considering the admissibility of the double hearsay in the police broadcast -- the evidence was sufficient to convict Mr. Juluke. *Id.* It remanded the case to the appeals court to consider Mr. Juluke's other assignments of errors. *Id.* On its initial hearing upon remand, the appeals court affirmed, by simply adopting the same reasoning it used to resolve co-defendant Mr. Leroy Nelson's appeal. *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 (4th Cir. 01/27/99)(on remand).

Thereafter, Mr. Juluke sought and obtained a rehearing in the intermediate appeals court, complaining about the failure to particularize the analysis to him. Ultimately, however, the appeals

-6-

court affirmed. *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 (4th Cir. 4/30/99)(on rehearing on remand).

Significantly, the Louisiana intermediate court found, in its original opinion following remand, that after examining the record, "it appears that Mr. Juluke was unrepresented." *State v. Juluke*, Slip Opinion, No. 96-KA-1920 (La. App. 4th Cir. 01/27/99). The record,[11] in fact, unquestionably confirms that Mr. Kee was not present for the MOSI hearing. In his absence, neither counsel representing Mr. Juluke's co-defendants endeavored to elicit from Mr. Raiford at the MOSI hearing whether Mr. Raiford, at the time of the shooting, was able to see which defendant was the driver of the vehicle, which held weapons, or what were each defendant's position in the car. He simply "identified" them with little exploration of the foundation for that "identification". Significantly as to Mr. Juluke, he said "think", i.e. "I think it was Bernell." He did not so qualify his identification of Mr. Juluke's co-defendants.

In concluding that Mr. Juluke suffered no "actual prejudice" as a result of his appointed counsel's absence at the *Wade*- MOSI hearing, the state courts refused to consider whether the types of questions that had been asked by other counsel, were the types of questions one would expect to be asked on Mr. Juluke's behalf during the uncounselled *Wade* hearing, and instead chose to focus on determining whether the record could establish that Mr. Juluke waived counsel. Acknowledging that the record showed that the trial court had asked only co-defendant Mr. Nelson, rather than Mr. Juluke, about waiver of counsel, the intermediate appellate court found that "it is impossible to tell whether Mr. Juluke waived the appearance of his counsel, Mr. Wade Key [sic]." *State v. Juluke*, Slip

---

[11] MOSI transcript 6/30/95, p. 2, lines 12-25.

-7-

Opinion, No. 96-KA-1920 (La. App. 4th Cir. 01/27/99).

After making those findings and acknowledgments, the Fourth Circuit, on original hearing following remand, refused to further address Mr. Juluke's claim that the absence of his counsel at a critical stage motion to suppress hearing was a structural error and was presumptively prejudicial, i.e. grounds for an automatic reversal without need to engage in harmless error analysis. *State v. Juluke*, Slip Opinion, No. 96-KA-1920 (La. App. 4th Cir. 01/27/99). Instead, the intermediate appellate court decided to apply "harmless error" analysis to the absence of counsel issue and found that "there is no showing that Mr. Juluke was prejudiced by his attorney's failure to be present at the hearing on the motion to suppress." *State v. Juluke*, Slip Opinion, No. 96-KA-1920 (La. App. 4th Cir. 01/27/99). As stated above, the state courts failed to consider whether Mr. Raiford had been appropriately questioned at the suppression hearing. The Court also brushed aside Mr. Juluke's other assigned errors, stating simply that they had been "discussed on the merits with respect to Mr. Juluke's co-defendant, Mr. Nelson, in this Court's prior opinion."

On rehearing, after Mr. Juluke complained about the Fourth Circuit's treatment of his Sixth Amendment claim, as well as its failure to particularize as to him, their discussion of the other errors he had first raised - - which his co-defendant, Mr. Nelson, had inappropriately adopted - - the Fourth Circuit acknowledged, but again completely avoided, any discussion of Mr. Juluke's demand for an automatic reversal based on presumed prejudice resulting from absence of counsel at a critical stage. Instead, as it did on original hearing, it only considered whether Mr. Juluke had shown "actual prejudice," this time tying their consideration of Mr. Juluke's Sixth Amendment claim to a discussion of whether Mr. Juluke's trial should have been severed from his co-defendants. In that context, it found that counsel's absence at a critical stage was only harmless error. *State v. Juluke*,

-8-

No. 96-KA-1920, on rehearing granted (La. App. 4th Cir. 4/30/99). The Louisiana Supreme Court

affirmed without further opinion. *State of Louisiana v. Juluke*, slip opinion, No. 99-K-1419 (La.

10/15/99).

Mr. Juluke then filed for state post-conviction relief and obtained an evidentiary hearing. At

the post-conviction hearing, Mr. Juluke introduced testimonial and documentary evidence of the

police communications on the night of his arrest, which evidence showed that the notorious former

New Orleans Police Department officers, Davis and Williams, not only were the first officers on the

scene, they were the source of all police communications to the police dispatcher purporting to relate

information about the suspect vehicle as well as the perpetrators. Mr. Juluke also showed that no

police broadcast of any perpetrators "name" occurred during Officer Felix's interview of Mr. Juluke

after Mr. Juluke was stopped for a traffic offense. Notwithstanding this new evidence, the state

district judge denied relief.

The intermediate state appeals court, [see, *Juluke v. Burl Cain*, No. 2001-K-1765 (La. App.

4th Cir. 11/08/01)], as well as the Louisiana Supreme Court, [*Juluke v. Burl Cain*, No. 2001-KP-

3171(La. 09/30/02 )] both affirmed without giving further reasons for judgment. This application

for federal habeas corpus relief follows.

Succinctly put, these are Mr. Juluke's federal habeas claims:

1.    Absence of Counsel Claim - His appointed attorney was absent for a critical pre-trial
      hearing, i.e. his MOSI, that is, *Wade*[12] hearing on June 30, 1995 at which the sole
      eye-witness (Mr. Samuel Raiford) testified about his "identification" of Mr. Juluke

---

[12] See, *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

as a perpetrator and Mr. Juluke did not waive the presence of counsel.[13]

2.   Suggestive I. D. Claim - Mr. Juluke did not receive a fair trial, and a mistrial should
     have been granted, as a result of the fact that only late in his trial, it was discovered
     that the earlier and repeated references to Mr. Raiford's identification of Mr. Juluke
     as a perpetrator were based on an impermissibly suggestive and constitutionally
     tainted identification procedure. More specifically, the record reveals that Mr.
     Raiford, the sole eye-witness, participated in the "identification" procedure at police
     headquarters only after he had been first informed by police that all three defendants
     were apprehended together while occupying a grey Chevrolet Baretta. Although Mr.
     Raiford eventually admitted that he did not actually see the color of the car, and that
     he did not actually see the driver of the vehicle during the shooting, because those
     admissions came so late in the trial, and only after the jury had first been repeatedly
     told by the police and Mr. Raiford, himself, about Mr. Raiford's "identification" of
     the color of the suspect vehicle, as well as what the State purported was his positive
     identification of Mr. Juluke at police headquarters, it failed to purge the impression
     left on the jury by the earlier and unconstitutionally suggestive identification of Mr.
     Juluke.

3.   Hearsay Claim - Impermissible reference was made at trial to double hearsay in the
     form of a police broadcast containing hearsay of former New Orleans Police Officers,
     Len Davis and Sammie Williams, who did not testify at trial. This hearsay unfairly
     bolstered the false suggestion that Mr. Raiford could, and did, identify the color of
     the suspect car. Moreover, it unfairly bolstered testimony by police and Mr. Raiford
     about Mr. Raiford's suggestive identification of Mr. Juluke as a perpetrator.

4.   *Brady/Giglio* Claim - The State withheld exculpatory and impeachment evidence
     tending to prove that:

     a.   Neither Mr. Raiford, nor anyone else, provided police with the names and
          clothing descriptions of the three perpetrators prior to defendants'
          apprehension - - this being significant as the State led jurors to believe that
          Mr. Raiford had been able not only to identify by name, all three of the
          perpetrators, but had even given clothing descriptions of all three perpetrators

---

[13] The record shows that the Court addressed Mr. Nelson and without the court making
any effort to explore competent and intelligent waiver, elicited a waiver of counsel's presence
from Mr. Nelson. All this must have taken presence out of the presence of Mr. Nelson's counsel,
Mr. Clyde Merritt, however, because at some point after the waiver discussion, Mr. Merritt, a
very busy attorney with the OIDP, who often handled matters simultaneously in several sections
of court, apparently stepped back into Judge Quinlan's Section of Court and took part in the
hearing.

prior to their apprehension;

b.     No less than twenty-three (23) minutes transpired between the shooting and the traffic stop, contrary to the Louisiana Supreme Court's assumption when it affirmed the sufficiency of evidence against Mr. Juluke;

c.     That someone - - and the evidence points to corrupt New Orleans Police Department Officers Davis and Williams, or their agents - - led Officer Felix to target a blue car. This is obviously significant as Mr. Raiford testified at a pre-trial hearing that the suspect vehicle was "turquoise green," but admitted late in trial that he did not see the color of the car; and

d.     Police were looking for a man named Pernell Mays,[14] but Mr. Mays' name was not broadcast during Officer Felix's interview of Mr. Juluke; and, in fact, no suspects name was broadcast at that time, contrary to the testimony of Officer Felix, the arresting officer.

5.     There was insufficient evidence of his guilt.

**JULUKE'S CLAIMS PASS THE
GUIDELINES FOR FEDERAL HABEAS CORPUS REVIEW
OF A STATE CONVICTION**

**The AEDPA Guidelines.**

The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), which amended 28 U.S.C. § 2254, applies to all habeas petitions filed after April 24, 1996, the effective date of the Act. See, *Lindh v. Murphy*, 521 U. S. 320, 326-327, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Felder v. Johnson*, 180 F.3d 206, 209 (5th Cir.1999). As this Complaint was filed after the effective date of AEDPA, it is governed by

---

[14] Mr. Juluke's half-brother, Mr. Mays, was a popular rap singer, widely known in the rap community for his number one hit, "Get It Girl", a rap tune that got wide play in popular rap music venues, such as Club Adidas in downtown New Orleans. Mr. Mays was murdered after the Santinac murder and his killers were never identified or caught. Mr. Juluke's half brother, Izell Henderson a.k.a. Izell Mays, a convicted felon, had, according to trial testimony, borrowed the grey car - - in which Mr. Juluke was arrested - - from Mr. Spurlock, the car owner, on the day of the murder.

AEDPA. AEDPA allows for the grant of a writ of habeas corpus with respect to a claim adjudicated on the merits in state court proceedings where such adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The court must presume that all determinations of factual issues made by the state court are correct, unless rebutted by clear and convincing evidence. See, 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court elucidated the independent meaning conveyed by the "contrary to" and "unreasonable application of" clauses of the statute, as well as the distinct analysis to be performed under each clause. *Williams,* 529 U.S. at 410, 120 S.Ct. 1495 (O'Connor, J., concurring).

**The "Contrary to" Standard**. A state court decision would be "contrary to" the Court's clearly established precedent if it "applie[d] a rule that contradicts the governing law set forth in [the Court's] cases." *Id.* "A state court decision will also be contrary to th[e] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent." *Id.* at 406, 120 S.Ct. 1495. Holdings, as opposed to the *dicta*, of the Supreme Court control whether the state court unreasonably applied clearly established federal law. *See Id.* at 412, 120 S.Ct. 1495.

**The "Unreasonable Application of" Standard**. A state court decision would involve an "unreasonable application of" clearly established Supreme Court precedent if it "identifies the

-12-

correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413, 120 S.Ct. 1495. Because Congress used the word "unreasonable" in § 2254(d)(1), and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411, 120 S.Ct. 1495. "[I]t is certainly ground for further inquiry if the state court ignores material facts." *Hurtado v. Tucker*, 245 F.3d 7, 20 (C.A.1 (Mass.) 2001).

*Williams's* holding sheds light on what is unreasonable. In *Williams*, the Court held that the Virginia supreme court's decision--that there was no constitutional violation from ineffective assistance of counsel--was an "unreasonable application of" clearly established federal law (as well as being "contrary to" clearly established federal law). See, 529 U.S. at 398-99, 120 S.Ct. 1495. The Virginia Supreme Court had accepted that counsel was ineffective at the penalty phase of the capital case, but found insufficient prejudice. The U.S. Supreme Court, however, rejected that lack of prejudice conclusion as unreasonable because it misapprehended the correct prejudice standard and failed to evaluate the "totality of the available mitigation evidence." *Id.* at 397, 120 S.Ct. 1495. Support for that conclusion was state supreme court's failure even to mention defendant's sole mitigation argument or to consider the possibility that mitigation evidence unrelated to dangerousness might have altered the jury's choice of the death penalty. See *id.* at 398, 120 S.Ct. 1495. As a result, the state supreme court had "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." *Id.*

**The Unreasonable Determination of the Facts Standard**. *Williams* did not discuss the

-13-

"separate provision provid[ing] for the habeas remedy when a state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding,'" which, the court said, was "not before us in this case."

However, in *Burdine v. Johnson*, 66 F.Supp.2d 854, 860 (S.D.Tex. 1999), the court recognized that state court findings of fact are binding on federal courts when such findings are "fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994) (amended 1996). Questions of fact are "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators....'" *Thompson v. Keohane*, 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Because "a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer 'presumptive weight'" [*Thompson*, 516 U.S. at 111, 116 S.Ct. 457], to overcome this presumption of correctness, the party challenging the state court's findings of fact must establish by clear and convincing evidence that the "factual determination by the state court was erroneous." 28 U.S.C. § 2254(d)(8) (1994) (amended 1996); *James v. Whitley*, 39 F.3d 607, 610 (5th Cir.1994).

With these guidelines in mind, attention is now turned to Mr. Juluke's entitlement to habeas corpus relief.

### Application of AEDPA

**A.**
**Juluke Relies Upon Clearly Established Rules of Law.**

Mr. Juluke satisfies the threshold question under AEDPA, namely whether he seeks enforcement of rules of law that were clearly established at the time his state court conviction became final. *Williams*, 529 U.S. at 390, 120 S.Ct. 1495. There can be no doubt that the five rules

of law that Mr. Juluke seeks to apply were clearly established by the Supreme Court.

**1. The "per se" prejudice rule for denial of counsel at a "critical stage" was clearly established.** The state courts found that "it appears Mr. Juluke was unrepresented" at the alleged critical stage. In fact, it is indisputable that Mr. Juluke's appointed counsel, Mr. Wade Kee, was absent at the pre-trial motion to suppress identification hearing (hereinafter, the "*Wade* and/or MOSI hearing") that took place on June 30, 1995.

It was clearly established by the Supreme Court, as of the time that Mr. Juluke's case was decided in state court, that the "complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice." *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 1038, 145 L.Ed.2d 985 (2000) (citing *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The Sixth Amendment requires that criminal defendants must be provided with counsel unless the right is competently and intelligently waived. See *Gideon v. Wainwright*, 372 U.S. 335, 339-45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Supreme Court has repeatedly emphasized, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Criminal defendants have a right to counsel not only at trial but also at all critical stages of the prosecution. See *Coleman v. Alabama*, 399 U.S. 1, 9-10, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); see also *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ("[I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.") (footnote omitted).

The inquiry into whether a particular proceeding is a critical stage of the prosecution focuses

-15-

on "whether potential substantial prejudice to the defendant's rights inheres in the ... confrontation and the ability of counsel to help avoid that prejudice." *Coleman*, 399 U.S. at 9, 90 S.Ct. 1999 (quotation omitted).

A *Wade* or MOSI hearing is a critical stage. See, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The Fifth Circuit has recently recognized:

> To justify a particular stage as "critical," the court has not required the defendant to explain how having counsel would have altered the outcome of his specific case. Rather, the Court has looked to whether "the substantial rights of a defendant may be affected" during that type of proceeding. *United States v. Taylor,* 933 F.2d 307, 312 (5th Cir.1991) (citing *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 256, 19 L.Ed.2d 336 (1967); *Gideon v. Wainwright,* 372 U.S. 335, 342-43, 83 S.Ct. 792, 795-96 (1963)); *see also United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (suggesting that a proceeding is critical when the accused is confronted by the legal procedural system or the expertise of a state adversary).

The Louisiana state court treatment of Mr. Juluke's Sixth Amendment claim was both contrary to, and an unreasonable application of, established federal precedent on complete absence of counsel cases. In cases other than Mr. Juluke's, Louisiana courts applying federal law have recognized that a pre-trial hearing on a motion to suppress evidence is a critical stage at which the right to the presence of defendant's chosen counsel attaches and the absence of counsel at that stage constitutes reversible error. See, *State v. Roberts*, 569 So.2d 671 (La.App. 2d Cir.1990); *State v. Crawford*, 660 So.2d 950 (La.App. 4th Cir. 1995). The treatment of Mr. Juluke's Sixth Amendment claim is, thus, an unexplained aberration in how Louisiana courts themselves apply federal precedent. Thus, not only is the state court treatment of Mr. Juluke's case "contrary to" clearly established federal precedent, it is contrary to Louisiana's own precedent applying federal precedent. Thus, the state court treatment of Mr. Juluke's Sixth Amendment claim is both contrary to and an

-16-

unreasonable application of federal Sixth Amendment precedent.

The complete absence of counsel at the pre-trial suppression hearing was aggravated by the introduction during Mr. Juluke's trial of a stipulation[15] as to what transpired during that uncounselled hearing. In *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), it was held to be error to admit at the trial the testimony of a witness given at a preliminary hearing when defendant was not represented.

**2. The prohibition against reference to suggestive identification evidence was clearly established.** Mr. Raiford, the State's sole eye-witness to the murder, testified late in Mr. Juluke's trial, that he did not see the driver of the car involved in the drive-by shooting.[16] However, that admission only came after there had been repeated reference throughout the trial to how Mr. Raiford positively "identified" all three defendants as the perpetrators of the shooting,[17] going so far as to

_____

[15] See Transcript of "Note of Evidence" taken before Judge Ward on April 26, 1996, appearing in Volume I of the Appellate Record, at p. 143. The stipulation read to the jury stated, in part:

> It is stipulated between the parties that if the transcript of the testimony taken on June 20 [sic], 1995 [were] displayed to the jury, it will show in part that Samuel Raiford appeared in Section "B" and testified. He was examined by the State of Louisiana, at which time he was asked the questions, "The car that drove by, do you remember what type of car it was?" The answer was, "Yeah, it was like a turquoise green Baretta." Also on the same date and under direct examination by the District Attorney, he was asked the question, "How did you ID them?" His answer was, "They were all lined up together."

[16] Trial Transcript 2/27/96 p. 80 (Raiford).

[17] See e.g. questioning by Prosecutor Steve Enright, "Once Mr. Raiford [sic] entered, what kind of time span are we talking about between the initial -- the murder, the time you arrived on the scene or get called to the scene or the time Mr. Raiford identified these individuals at the homicide office?," Trial Transcript p. 24; questioning by Clyde Merritt to Detective Tamborella, "So after Mr.

falsely suggest that he gave clothing descriptions of the perpetrators before their apprehension.

At the *Wade* hearing, which Mr. Juluke's counsel did not attend, Mr. Raiford gave some indication that he had a problem identifying Mr. Juluke. In a clear expression that his "identification" was only tentative, Mr. Raiford testified as follows under questioning by Assistant District Attorney, Karen Carter:

> Q. The car that drove by, do you remember what type of car it was? A. Yeah, it was like a turquoise green Baretta?
> Q. Did you recognize anyone in that Baretta? A. Yeah.
> Q. And who did you recognize? A. That was them.
> Q. Who is "them?" A. Bernell, Kunta and Sidney?
> Q. Okay, are they present today? A. Huh?
> Q. Are they present today in court? A. Yeah.
> Q. Where are they? A. Right there (indicating).
> Q. Who was the driver of the car? A. I think it was Bernell.

See, MOSI Trans. (6/30/95) at p. 3-4.

Late in trial, Mr. Raiford disclosed that his certainty about his identification of Mr. Juluke as the driver was founded not on his having seen the driver during the shooting, but rather on the fact that police had informed him that Mr. Juluke had been arrested in a car with the co-defendants. In Mr. Raiford's words:

> Q. And how are you so sure he [Mr. Juluke] was in the car that night?
>
> A. Because when I saw and I I.D.'d the other two and the man said he caught him when he got off the interstate and he was with them, so . . .
>
> Mr. Kee: Objection, Your Honor. Is he going to testify to what someone else told him?
>
> The Court: I'll sustain that.

---

Raiford identified these three individuals in the Robbery or Homicide Division, you then had them arrested and photos taken, correct?" "Yes, sir." Trial Transcript, 2/28/96 p. 47.

| Mr. Parker: | Don't say what anyone else told you. |
|---|---|
| Q. | How are you so sure that Bernell was in the car? |
| A. | When I came down to the place to I.D. - - |
| Mr. Kee: | Objection, Your Honor. After the fact. He's getting ready to testify to hearsay, because he can't say what he saw, how he was in the car. He's testifying that he saw him at the station . . . . |
| Mr. Parker: | He's not getting ready to say anything about hearsay. |
| The Court: | Just a minute. I'm going to sustain unless he knows of his own personal knowledge. Let's go back to the time of the shooting. Let's first determine him at the time of the shooting. Go ahead. |
| Q. | Could you identify him at the time of the shooting? |
| A. | No, I can't. |
| Q. | How did you identify him later? |
| Mr. Kee: | Your Honor, I know this is premature, but I don't want him to say something that's hearsay and then it's too late for me to object. He's eliciting hearsay testimony - - |
| Mr. Parker: | No, I'm not. |
| The Court: | I want the objection made and then I want your response made. I'm going to sustain it at this time unless I have some further evidence that is the basis other than hearsay. I don't have it at this time. Sustained." |

See, Trial Transcript (2/27/96) at p. 79 - 80.

Given this testimony, it is clear that Mr. Raiford's so-called "identification" of Mr. Juluke

at police headquarters was tainted by police suggestion and should have been suppressed. Moreover,

a mistrial should have been declared upon Mr. Raiford's above testimony about the tainted

"identification," in view of all of the prior testimony and references to that "identification."

The Due Process Clause protects accused individuals from the use against them of evidence

-19-

derived from unreliable identifications that resulted from impermissibly suggestive procedures. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir.1993); *U.S. v. Rogers*, 126 F.3d 655, 658 (C.A.5 (La.) 1997).

When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that the identification testimony be reliable. See, e.g., *Manson v. Brathwaite*, 432 U.S. 98, 112-14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States v. Wade*, 388 U.S. 218, 288 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Suggestive identification procedures "increase the likelihood of misidentification," and "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. at 198, 93 S.Ct. 375; see generally *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (Due process right includes the right not to be the object of suggestive police identification procedures that create "a very substantial likelihood of irreparable misidentification"); *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (examining whether procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law").

The five factors to be weighed in determining reliability are: 1) the opportunity of the witness to view the perpetrator during the crime; 2) the witness's degree of attention to the perpetrator; 3) the accuracy of the witness's prior descriptions of the perpetrator; 4) the level of certainty demonstrated by the witness when identifying the suspect; and 5) the length of time between the crime and the identification. See *Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375 (1972). "Against these

factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). None of those factors were explored as to Mr. Juluke at the uncounselled *Wade* hearing.

A defendant's Constitutional protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain. See, e.g., *Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir.1981). While a witness is entitled to become surer of an identification, Due Process precludes the generation of that increased certainty through police suggestion. See, e.g., *Simmons v. United States,* 390 U.S. at 383, 88 S.Ct. 967; *Dickerson v. Fogg*, 692 F.2d 238, 244-45 (2d Cir.1982); *Solomon v. Smith*, 645 F.2d at 1185; cf. *United States v. Wade*, 388 U.S. at 240-41, 87 S.Ct. 1926.

Here, through improper police suggestion and leading questions by the prosecutor at trial, Mr. Raiford went from testifying at the uncounselled Wade hearing that "I think it was Bernell"[18] to the following:

> Q.   Were all three together when you identified them?
> A.   Not the first time.
> Q.   Are you sure about your identification?
> A.   Yes, I am.
> Q.   Are you positive that the people that you saw in the car that night - -
> A.   Yes, I am.
> Q.   Would you have any reason to not tell us the truth about this?
> A.   No, I hadn't. No, I don't.

See, Trial Transcript (02/27/96) at p. 77.

The Fifth Circuit applies the harmless error standard to the admission of suggestive

---

[18] See, MOSI Trans. (6/30/95) at p. 3-4.

identification evidence. See, e.g., *United States v. Rogers*, 126 F.3d 655, 659 (5th Cir.1997). Here, admission of testimony about Mr. Raiford's identification of Mr. Juluke as a perpetrator was not "harmless error". He testified (at least at first) that he saw and could correctly identify not only the car that was involved in the drive-by shooting event, but also that he had identified all <u>three</u> perpetrators, and suggested he could actually give clothing descriptions of the perpetrators.

The opening statement of the prosecution was that all three defendants were positively identified by the eye-witness, Mr. Raiford. More particularly, Prosecutor Steven Enright stated:

> These three individuals drove by, two of them hanging out of the passenger side of the window of the vehicle firing AK-47 assault rifles. One of those pellets fired from that assault rifle killing Rondell Santinac. He lost his life there in that car and fell over onto the witness, Samuel Raeford, who will be here today, who will take the witness stand and testify to you. Mr. Raeford very fortunately escaped unharmed and was able to contact the police and give a description of what he had seen.

> A very short time thereafter, these three individuals were arrested and taken down to the homicide office, where Mr. Raeford identified these three as being the individuals who were in the car firing the shots that killed Rondell Santinac. All three are charged with first-degree murder.[19]

During trial, the State at first elicited testimony from Mr. Raiford that he not only saw the three perpetrators commit the murder but he also had such a good view of the murder, he could give the perpetrators' clothing descriptions. However, after Mr. Raiford eventually admitted that he did not see the color of the car or the driver, or Mr. Juluke, the prosecution argued, in closing, that Mr. Raiford was simply confused regarding the color of the car, but that he indeed knew what he saw as concerns the perpetrators. More specifically, the prosecutor argued:

> [T]hey [attorneys at the defense table] want to have you believe that when Samuel came in here in June of last year, July of last year, a motion hearing, and said

---

[19] Supplemental Trial Transcript (2/29/96), Opening Statements, at p. 3.

something about turquoise and whether turquoise was in his vocabulary, I wasn't there in June. I don't know. But when they talk about turquoise green, if he didn't tell the cops on the scene what the description was, what was Tommy Felix looking for? He told you he had his radio on. He got the description. See, this happened in the Fifth District. Felix worked in the First District. The description was broadcast to the First District where Felix heard it. He said, we were targeting something. Even one of their witnesses came up here and said a traffic stop. That was no traffic stop. He had a target. His target was this car right here. That is Felix's target. He was by himself. He had a target. The target he got from the dispatcher. The dispatcher got it from the Fifth District. The Fifth District got it from Sam Raeford. Turquoise green, motion hearings? That boy don't know what a motion hearing is. But he knows what he saw.[20]

More egregiously, taking advantage of the defense table's failure to obtain the police communication logs, which the Mr. Juluke only later obtained and introduced at the evidentiary hearing during his state post-conviction proceeding and which prove that clothing descriptions were **not** part of any police broadcast that night as concerns this murder, nor were the defendants' names broadcast, Prosecutor Parker argued: "He had ample opportunity to see their faces, to recognize them as people he had known for over four months and to describe them to the police and for them to put this dispatch out for the First District."[21]

The bottom line is that there was insufficient competent evidence to establish Mr. Juluke's guilt beyond a reasonable doubt. At the post-conviction hearing, it was proved through hard documentary evidence, i.e. the police communication logs, that no less than twenty-three (23) minutes transpired between the time of the shooting and the police stop of the car driven by Mr. Juluke. No guns or bullets were found in that vehicle. The only evidence the State had to attempt to tie Mr. Juluke to the shooting was testimony about Mr. Raiford's suggestive "identification." This

---

[20] Supplemental Trial Transcript (2/29/96), Closing Arguments, at p. 86-87.

[21] Supplemental Trial Transcript (2/29/96), Closing Statements, at p. 101-102.

from a witness who vacillated from stating that he positively "identified" Mr. Juluke as a perpetrator, to admitting that he did not see the driver of the car or Mr. Juluke during the shooting. Beyond the suggestive identification evidence, the State relied on multiple layers of hearsay, speculation, and innuendo, as well as, pre-trial and trial errors made by Mr. Juluke's ineffective defense counsel resulting from counsel's complete absence at the *Wade* hearing, his failure to compel production of the police communication logs, his failure to compel production of the initial police report prepared by corrupt police officers Sammie Williams and Len Davis, his inability to cross-examine Williams and Davis about the police report they prepared, his failure to compel the attendance and cross-examine Officers Williams and Davis about the "information" that was radioed from their police unit that led to the traffic stop, and his inability to effectively cross-examine Mr. Raeford or Officer Felix without the police radio transmission logs. Such a process of convicting someone and sending them to jail for the rest of their life fails the Fair Trial/ Due Process and "beyond a reasonable doubt" standards required by the Constitution.

**3. The prosecution's duty to disclose exculpatory and impeachment evidence were well-established**. The prosecution failed to disclose a copy of the initial police report and also the police communication log before trial. Those documents contained exculpatory and impeachment evidence, as detailed above.

Pursuant to the rule enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. It was well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Carriger v. Stewart*, 132 F.3d 463, 479

(9th Cir.1997) (en banc).

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Even absent a specific *Brady* request, the prosecution must disclose exculpatory evidence that, when viewed in the context of the entire record, "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Here, the initial police report of Officers Davis and William as well as the police communication log were *Brady* and *Giglio* evidence that was in the State's possession that was not disclosed to defendants despite their request.

Beyond that, the prosecutions's apparent suppression of Mr. Raiford's inability to identify Mr. Juluke as the driver is also a constitutional violation. That the prosecution, indeed, knew going into the case, that Mr. Raiford could not be counted on to identify Mr. Juluke can be discerned from how it responded to its obligations under article 766 of the Louisiana Code of Criminal Procedure. Under that state rule of procedure, the prosecution is required to make certain disclosures during its opening statement. More specifically, that article requires the prosecution to "explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."

An examination of the opening statement given in this case by Prosecutor Enright is telling. It does not set forth that the prosecution would prove that Mr. Juluke was the driver of the car involved in the shooting or that the evidence would reveal that Mr. Gable and Mr. Nelson were the shooters. It strongly suggests that going into trial, the prosecution well knew that Mr. Raiford could not be counted upon "to identify" Mr. Juluke as the driver at the time of the shooting and that something was amiss about its case, i.e. that there was a disconnect between the police communication logs and Mr. Raiford's "identification" testimony.

However, once trial was underway, and Mr. Raiford, at least at first, appeared to be coming through with testifying about having "positively" identified Mr. Juluke, the prosecution was emboldened to ask additional questions that elicited testimony from Mr. Raiford that should have toppled the house of cards of the State's case against Mr. Juluke, were it not for Mr. Juluke's counsel's ineffectiveness - - an ineffectiveness brought on in large part by:

- his absence at the *Wade* hearing;

- his failure to explore the *Biggers - Brathwaite* factors and the lack of foundation for Mr. Raiford's "identification" at the Wade hearing that he did not attend;

- his failure to earlier discover the police suggestion behind the "identification;"

- his failure to follow up on what he should have known about Mr. Raiford's "uncertainty" and speculation about Mr. Juluke's involvement in this murder (as evidenced by Mr. Raiford's use of the phrase "think it was Bernell" at the MOSI hearing) by taking steps to compel production of the police communication logs and the initial police report of Williams and Davis so that he could show that those two killer cops were the source of information in the police broadcast that led to the traffic stop of the vehicle driven by Mr. Juluke.

-26-

Even if the State's pre-trial knowledge of problems with Mr. Raiford's "identification" of

Mr. Juluke, and its need to rely upon hearsay of Officers Davis and Williams, is not as apparent to

this Court, as it is to undersigned counsel, a former prosecutor with Mr. Connick's office, who

knows that prosecutors in that office routinely are provided by their police investigators with copies

of police communication logs before trying an important case, such as a three-defendant first degree

murder case, and that receipt and review of those logs is an item that the Chief of Trials specifically

"pre-tries" with the prosecutors, there are reasons why this Court should hold the State to knowledge

of its case and deem that the State (prosecutors and police) did know, or at least should have known,

and disclosed, that Mr. Raiford could not be counted upon to "positively identify" Mr. Juluke as a

perpetrator. It should be an objective standard, i.e. what the State knew, or *should have known*,

about their case.

The result of imposing such an objective standard is that the Court should deem the State

(police and prosecutors) to have known that their sole eye-witness, Mr. Raiford, could not be

counted upon to identify Mr. Juluke at trial because he, indeed, as he eventually testified, never saw

the color of the car, nor did he see who was behind the wheel of that car at the time of the shooting,

absent police suggestion; that there certainly were no clothing descriptions put out in the police

broadcast; that, indeed, as shown by the police communication logs, no police broadcast occurred

during Officer Felix's traffic interview of Mr Juluke; and that it is a reasonable inference that if,

indeed, Officer Felix thought he recalled some "change of name," it was only because he had heard

the broadcast of one name *before* he stopped the vehicle driven by Mr. Juluke, but that upon

interviewing the occupants of the car, none possessed the name Officer Felix heard broadcast prior

to his traffic stop of the vehicle.

-27-

Left in the dark by his own failure to attend the MOSI hearing, and not let out of the dark by the State's opening statement, counsel for Mr. Juluke, Mr. Kee, blindly went into trial assuming that the State would elicit some observational foundation (the *Biggers - Braithwaite* factors) for Mr. Raiford's' identification of Mr. Juluke as the driver-perpetrator.[22] Had it been disclosed to Mr. Kee that Mr. Raiford's so-called "identification" of Mr. Juluke was only the product of suggestion and speculation, and would crumble with a minimum of probing, Mr. Kee's entire defense of this case would surely have been different. Mr. Kee certainly would not have told the jury, as he did during his opening statement, that Mr. Raiford "identified" Mr. Juluke as a perpetrator. First impressions stick with a jury. It was unfair for the State to allow Mr. Kee to make such an opening statement to the jury, knowing that Mr. Raiford could not be counted upon to identify Mr. Juluke, as certainly the State must be deemed to have known if they had spoken at all with Mr. Raiford, as it must be supposed that they did. Moreover, Mr. Kee would have been vigilant to any questioning by the prosecutor assuming this fact not in evidence: Mr. Raiford's identification of Mr. Juluke as the perpetrator- driver.

But even before a disclosure obligation arose during the opening statements, the obligation of the State to advise Mr. Juluke about Mr. Raiford's uncertainty in identifying Mr. Juluke arose earlier, and in response to the Application for Bill of Particulars tendered to the State by Mr. Juluke's attorney, to which answers were filed by the State,[23] and which propounded the following inquiry:

> 57. Did the State obtain or does the State have any exculpatory evidence or evidence favorable to the defense and if so, what is the nature and description

---

[22] Transcript of opening statement of Wade Key, p. 14.

[23] Record, p. 82-83.

-28-

of such evidence?

The State's response was, "None, other than that which has been provided."[24]

There is absolutely nothing in the record indicating that the State advised Mr. Kee that Mr. Raiford could not be relied upon at trial, nor indeed, did he ever, positively identify Mr. Juluke, without police suggestion, as the driver of the vehicle at the time of the shooting. The State's failure to disclose Mr. Raiford's uncertainty was a violation of *Brady* and *Bagley*.

**4. Habeas corpus relief is clearly available where trial errors, evidentiary rulings and/or ineffective counsel allow hearsay to be admitted that infringes on the Right of Cross-Examination and violates the Confrontation and Due Process clauses; that is, where it substantially affects the right to a Fair Trial.** That a criminal defendant has a constitutionally protected right to cross-examine adverse witnesses is well established and widely recognized. In *Pointer v. Texas, 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965),* for example, the Supreme Court observed:

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

*Id. at 405.* Additionally, in *Davis v. Alaska,* 415 U.S. 308, 320, 94 S. Ct. 1105, 39 L. Ed. 2d 347, (1974), the Court called the ability to effectively cross-examine adverse witnesses in a criminal case a "vital constitutional right." See also, *Barresi v. Maloney*, 296 F.3d 48 (1st Cir. 7/23/02).

---

[24] Record p. 83.

Here, the prosecution made reference to the contents of a police broadcast purporting to contain Officers Davis and Williams' account of Mr. Raiford's identification of Mr. Juluke as a perpetrator. The State elected not to call these discredited and infamous former police officers as witnesses at trial.

Because at trial, Mr. Raiford ultimately admitted to not having seen who drove the car or even the color of the car, there was no corroboration of the double hearsay information sourced to Officers Davis and Williams. During the post-conviction hearing, Mr. Juluke established, with documentary evidence, that all communications to the police dispatcher concerning the description of the suspect car and the perpetrator or perpetrators came from the police Unit 518, driven by Officers Davis and Williams.

The hearsay of Officers Williams and Davis was admitted in the form of hearsay within hearsay in the form of uncorroborated testimony from Officer Felix about a police broadcast that was crucial to the prosecution's case. The State prefaced the introduction of Officer Felix's testimony with that of Detective Tamborella. Detective Tamborella first told the jury, "The identification was put out over the air. He [Raiford] had to know who he [the perpetrators] was or they wouldn't have put the information on the police radio."[25]

Prosecutor Julian Parker's rebuttal argument heavily relied upon the hearsay in Officer Felix's testimony, as is apparent from this statement to the jury:

> And I'm going to tell you that, although he was only on the stand for a very short period of time, the critical witness in this case is Officer Tommy Felix. . . . He told you he had his radio on. He got the description. See, this happened in the Fifth District. Felix worked in

---

[25] See, Trial Transcript, (02/27/96), at p. 35-36.

the First District. The description was broadcast to the First District where Felix heard it. He said, we were targeting something. . . . That was no traffic stop. He had a target. His target was this car right here. This is Felix's target. . . . The target he got from the dispatcher. The dispatcher got it from the Fifth District. The Fifth District got it from Sam Raiford [sic]. Turquoise green, motion hearings. That boy don't know what a motion hearing is. But he knows what he saw.[26]

Indeed, Mr. Raiford knew what he did, and did not, see. He told the jury, only too belatedly, that he did not see the color of the car and he told the jury that he did not see who was behind the wheel of the car from which the shots were fired. If the jury heard otherwise, it heard it from Detective Tamborella, it heard it from the attorneys trying this case (referring to Mr. Raiford's "identification" of all three perpetrators in their questioning and argument), and it heard it through the compound hearsay testimony related by Officer Felix about the police broadcast. All this violated "[t]he Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right . . . made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403. See also *Douglas v. Alabama*, 380 U.S. 415; *Brookhart v. Janis*, 384 U.S. 1 ; *Barber v. Page*, 390 U.S. 719; *Roberts v. Russell*, 392 U.S. 293; *Illinois v. Allen*, 397 U.S. 337; *California v. Green* 399 U.S. 149 .

The United States Supreme Court has said that "the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green*, 399 U.S., at 161.

**5. Insufficient evidence.** In *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808

---

[26] Transcript of closing argument, p. 87. (Julian Parker).

(1995), the Supreme Court recognized the distinction between habeas petitioners who assert that their actual innocence in itself presents a violation of their constitutional rights--as in *Herrera v. Collins*, 954 F.2d 1029, 1034 (5th Cir. 1992)(quoting *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 759, 9 L. Ed. 2d 770 (1963)), aff'd, 506 U.S. 390, 122 L. Ed. 2d 203, 113 S. Ct. 853 (1993) -- and habeas petitioners who assert that their actual innocence acts as a catalyst to bring them within that "narrow class of cases" in which the refusal of the court to hear their underlying constitutional claims will result in "a fundamental miscarriage of justice." 115 S. Ct. at 860-61. Actual innocence in this second type of petition is not itself a basis for federal habeas relief; it is, however, "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 861.

The Court further has recognized that a fundamental miscarriage of justice may be demonstrated by a showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 115 S. Ct. at 864 (citing *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986)). To satisfy this standard, a petitioner must show that he is "actually innocent." *Id.* To demonstrate actual innocence, it is necessary that the petitioner "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt . . . in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.*

Mr. Juluke has made this showing. The fact that he made this showing is demonstrated by the decision of the state intermediate and state supreme court's opinions on direct appeal. During his direct appeal of right, the Louisiana Supreme Court found that Mr. Raiford had positively

-32-

identified Mr. Juluke's co-defendants, Messrs. Gable and Nelson, as the shooters. It further found that Mr. Raiford, at trial, "unexpectedly" failed to identify Mr. Juluke. Without the benefit of the written police communications logs, which revealed the connection of Officers Davis and Williams to this case, and with no other contemporaneously generated documentary evidence from which to accurately pinpoint the length of the delay between the time of the shooting and Mr. Juluke's arrest, the Louisiana Supreme Court, on direct appeal, assumed that only as little as ten (10) minutes "separated the shooting in the Desire Project from the traffic stop near the Iberville Project." In the context of that brief time-span, the Louisiana Supreme Court did not consider it to be a reasonable hypothesis that someone other than Mr. Juluke was the perpetrator-driver. *State v. Juluke*, 725 So.2d 1291, 1294 (La. 1999).

On post-conviction following an unsuccessful direct appeal of right, petitioner, making use of the police communication logs, adduced clear and convincing evidence that no less than twenty-three (23) minutes elapsed between the shooting and the traffic stop. The logs[27] did so by establishing that police received a 911 call of the shooting at 9:22 p.m. (thus establishing that the

---

[27] As stated above, petitioner applied for post-conviction relief in the state trial court and obtained an evidentiary hearing, in the process of which he discovered the New Orleans Police Department's computer "Complaint History," also known as the data communications logs (hereinafter "logs"). Those logs were entered into evidence at the evidentiary hearing seeking post conviction relief. As explained by Officer James Gallagher, who testified at the state post-conviction evidentiary hearing, and who drafted the computer program which generated these logs, the logs are the computer records that are generated in connection with 911 phone calls and memorialize police response to criminal complaints, giving "a printed chronological listing of that information that was entered into the computer as relates to a particular call for police service." See, Transcript of Post-Conviction hearing, at 8, lines 17-20. The importance of these logs to petitioner's habeas corpus petition are that they undermine important assumptions, detailed in his Post Conviction Application to the Louisiana Supreme Court, that were made by that Court, as well as by the state intermediate appellate court when it engaged in its harmless error analysis on direct appeal. That analysis, therefore, needs to be revisited.

shooting occurred at least before 9:22 p.m.) and that Officer Felix radioed in at 9:45 p.m. that he had

spotted a suspect vehicle. The logs also provided hard documentary evidence that there was no

police broadcast of any perpetrator's name during the traffic stop. Thus, Mr. Juluke disproved the

two pieces of crucial[28] circumstantial evidence relied upon by the Louisiana Supreme Court, i.e. the

length of the delay between the shooting and traffic stop, as well as Officer Felix's claim that Mr.

Juluke "changed his last name after hearing a follow-up report about the Santinac shooting claim

from the police dispatcher over the patrol unit's radio." 725 So.2d at 1292. Mr. Juluke could not

hear a broadcast that never occurred during the traffic stop.

Even if the court accepts that Mr. Juluke's co-defendants were convicted by sufficient

evidence based upon Mr. Raiford's testimony that he, at least, saw and could identify the shooters,

the fact that Mr. Juluke may have been with Messrs. Gable and Nelson earlier in the day and also

with them some twenty-three (23) minutes or more after the shooting, does not exclude the

reasonable hypothesis of innocence that he was not with them at the time and place of the shooting.

It is entirely reasonable to hypothesize that someone other than Mr. Juluke, perhaps Davis or

Williams or their directives, perhaps Mr. Russell Spurlock (the owner of the car), or Mr. Izell

Henderson (who, according to trial testimony, had borrowed the car from Mr. Spurlock the day of

the murder), or perhaps someone named Mr. Pernell Mays (whose name appears on police

---

[28] This Court can review evidentiary rulings by the standard that "the erroneous admission of prejudicial evidence can justify habeas corpus relief only if it is material in the sense of a crucial, critical, highly significant factor." *Anderson v. Maggio,* 555 F.2d 447, 451 (5th Cir.1977); *Cronnon v. State of Alabama,* 587 F.2d 246, 250 (5th Cir.), *cert. denied,* 440 U.S. 974, 99 S. Ct. 1542, 59 L. Ed. 2d 792 (1979).

communication logs as a suspect), could have been driving the car during the shooting.[29]

The state intermediate court (during Mr. Juluke's direct appeal of right), which did not have

the benefit of the police communication logs, had opined that in the span of 25 minutes between the

shooting and the traffic stop, Mr. Juluke's apprehension in the company of Mr. Gable and Mr.

Nelson was simply insufficient to convict him. The court said:

> "Although there were no eye witnesses to identify Juluke as the driver of the vehicle
> at the time of the shooting, Juluke could have been the driver and co-defendant in the
> crime. However, the State did not negate every reasonable possibility that the
> defendant was not the driver during the drive-by shooting. The evidence does not
> exclude every reasonable hypothesis of innocence since there was time for the driver
> of the car to switch places with Juluke, and thus the evidence was insufficient to
> support Juluke's conviction."

*State v. Kunta Gable, Bernell Juluke, Jr. and Leroy Nelson*, Slip Opinion, No. 99-KA-1920 (4th Cir.

1/21/98), at p. 18-19.

Unfortunately, that correct view of the insufficiency of *competent* evidence escaped the

Louisiana Supreme Court on direct appeal, and the issue was not revisited in detail by the state

---

[29] From Mr. Juluke's point of view, at 9:45 p.m., having just left the Iberville Housing
Project, he was observed committing a traffic violation. The Iberville Housing Project is located
just outside the French Quarter, a considerable distance from the Desire Housing Project.
Petitioner was driving a Chevrolet Baretta that was owned by his cousin, Russell Spurlock
(previously convicted of a felony firearm's charge), who had loaned it earlier that day to
petitioner's half-brother, Izell Henderson. Both Spurlock and Henderson who were outside an
Iberville Housing Project apartment, located just steps away from the scene of petitioner's arrest,
walked down to talk with police at the scene of petitioner's arrest, where they were questioned.
Riding as passengers in the car at the time of the traffic stop were Mr. Gable and Mr. Nelson. As
stated, there were no weapons in the car. The state's case fails to disprove that Mr. Juluke only
entered that car after the Santinac shooting, after arguing with Mr. Gable and Nelson, minutes
before his arrest. Mr. Henderson testified that he had borrowed the car in question from Mr.
Spurlock earlier in the day, and upon his return to the Iberville housing project, he gave the keys
to petitioner and told him to go get something to eat. That was only moments before petitioner
was stopped by the police just outside the Iberville project and within view of Mr. Spurlock and
Henderson. See, Trial Transcript, (2/28/96) at p. 68-69, 125.

-35-

courts on post-conviction after Mr. Juluke undermined, with clear and convincing hard documentary evidence adduced at the post-conviction hearing, the incorrect factual assumptions that had been made by the Louisiana Supreme Court on direct appeal. The state courts, therefore, committed a federal constitutional violation by not undertaking a review of all evidence in the record, inclusive of the post-conviction evidence, and analyzing whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt . . . in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial" as required by *Schlup*, 115 S. Ct. at 864 (citing *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986)).

It, therefore, falls to this Court to undertake that task. The Fifth Circuit, in *Burdine*, 66 F.Supp.2d at 860, recognized that conclusions of law, "as well as mixed questions of law and fact, are reviewed *de novo*." *Johnson*, 180 F.3d at 210 (citing *Johnson v. Puckett*, 176 F.3d 809, 814 (5th Cir.1999)); see also *Bryant v. Scott*, 28 F.3d 1411, 1414 (5th Cir.1994). "So-called mixed questions of fact and law ... require the application of a legal standard to the historical-fact determinations...." *Townsend*, 372 U.S. at 309 n. 6, 83 S.Ct. 745.

Although bound by the findings of historical fact, the federal courts, on habeas application, are not bound by state court determinations of either law or mixed questions of law and fact. *Norris v. Wainwright,* 588 F.2d 130 (5th Cir. 1979); *Mason v. Balcom*, 531 F.2d 717 (5 Cir. 1976); *Lee v. Hopper*, 499 F.2d 456, 462 (5 Cir. 1974); *Davis v. Heyd*, 479 F.2d 446, 450 (5 Cir. 1973). In other words, as to questions of law and mixed questions of law and fact, the reviewing court is permitted to substitute its own judgment for that of the other court. See, e.g., *Barrientos v. United States*, 668

-36-

F.2d 838; *Baty v. Balkcom*, 661 F.2d 391, 394 n.7 (5th Cir. 1981), *Baker v. Metcalfe*, 633 F.2d 1198,

1201 (5th Cir.), cert. denied, 451 U.S. 974, 101 S. Ct. 2055, 68 L. Ed. 2d 354 (1981).

The ultimate determination of sufficiency of evidence is a mixed question of law and fact,

and, thus, qualifies for independent review by this Court. This inquiry begins with the underlying

facts of the case as it requires this Court to apply those facts to the applicable law.

Mr. Juluke maintains that the intermediate state appellate court's original decision was right

as to the insufficiency of the evidence, i.e. that there was a reasonable hypothesis of innocence,

namely, that someone other than Mr. Juluke drove the car during the shooting. He points out that

the Louisiana Supreme Court only rejected that hypothesis because it was of the mistaken notion that

as little as ten (10) minutes had transpired between the shooting and the traffic stop, when in fact,

as adduced by clear and convincing hard documentary evidence adduced at the post-conviction

hearing, that at least twice that time elapsed, putting the true facts nearer to time frame determined

by the state court of appeal that opined that the evidence was insufficient.

Moreover, Mr. Juluke further adduced clear and convincing evidence at the post-conviction

hearing, which undermined the credibility of other elements of the State's circumstantial evidence

case against him, namely, Mr. Raiford's "identification" testimony and the "change in name"

testimony of Officer Felix.

It is well-established that in reviewing a sufficiency of the evidence claim, the Courts must

consider "whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);

accord *United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir.1995). Here, no such finding can

be made.

B.
**State Violations of the Rules of Law and**
**The Unreasonable Actions of the Louisiana Supreme Court**.

Because there is clearly established law applicable to Mr. Juluke's five (5) claims, the next question to be addressed is whether the Louisiana Supreme Court's decision rejecting Mr. Juluke's claims was "contrary to" or "an unreasonable application of" that established law; or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

Complicating this Court's task is the Louisiana Supreme Court's unexplained resolution of Mr. Juluke's assignments of error on direct appeal, as well as on post-conviction, where it affirmed the conviction without issuing any written opinion, save as to the insufficient evidence claim.

The First Circuit has held that "[i]n the absence of reasoning on a holding from the state court on the issue, we cannot say the claim was "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d)." In such cases, the First Circuit reviews the claim "de novo as 'we can hardly defer to the state court on an issue that the state court did not address.'" *Brown v. Maloney*, 2001 WL 1181109 at *3 (C.A.1 (Mass.) 2001) citing, *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir.2001). A similar result was reached by The Ninth Circuit in *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir.2000), which confronted with "postcard denials" from a State's supreme Court, conducts its own "an independent review of the record . . . to determine whether the state court clearly erred in its application of controlling federal law." *Id.* at 982.

The Fifth Circuit has stated in *Steward v. Cain*, 259 F.3d 374, 377 (C.A.5 (La.) 2001), that it applies the following presumption: "[w]here there has been one reasoned state judgment rejecting

-38-

a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground," citing *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991). It considers the presumption appropriate because "silence implies consent" and courts affirm "without further discussion when they agree, not when they disagree, with the reasons given below." *Ylst* 501 U.S. 797, 111 S.Ct. 2590, 2595. *Ylst* defined an unexplained order as "an order whose text or accompanying opinion does not disclose the reason for the judgment." *Id.* at 2594.

**1. The Louisiana Supreme Court affirmed the lower court's apparent refusal to apply the "per se" prejudice rule to Mr. Juluke's counsel's absence at a "critical stage"; that refusal was "contrary to" or "an unreasonable application of" established law.** Not once in this case has any Louisiana court properly acknowledged United States Supreme Court precedent holding that a criminal defendant is entitled to counsel at every critical stage and that counsel's absence is presumptively prejudicial. Under these circumstances, it must be presumed that the Louisiana Supreme Court was acting "contrary to" and/or was guilty of an unreasonable application of controlling federal law.

Alternatively, the Louisiana Supreme Court's decision was contrary to clearly established Federal law because it apparently approved the application of the actual prejudice standard of *Strickland* instead of the per-se presumed prejudice analysis of *Cronic* and *Powell v. Alabama*, 287 U.S. at 45, 53 S.Ct. 55.

In the further alternative, Mr. Juluke proved actual prejudice from counsel's absence at a critical stage, and other errors of counsel, thus the state court's finding of no prejudice was an unreasonable application of clearly established Federal law because Mr. Juluke was, indeed, actually prejudiced. But for counsel's deficient performance, there is a reasonable probability that the jury

-39-

would not have returned a guilty verdict. The State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the evidence of prejudice arising from counsel's alleged defective performance -- considering the evidence adduced at trial, as well as the evidence adduced in the state post-court proceeding.

Mr. Juluke's appointed counsel failed to attend a *Wade* / MOSI hearing -- a critical stage -- and hence failed to assert petitioner's pre-trial right to probe (out of the jury's hearing) whether Mr. Raiford's identification of Mr. Juluke was merely the product of police suggestion and/or conjecture. This structural error was not harmless; in Mr. Kee's absence, counsel for Mr. Juluke's co-defendants failed to probe the foundation for the tentative identification[30] that Mr. Raiford made of Mr. Juluke at the *Wade* hearing. As a result, Mr. Juluke's counsel was ill-equipped at trial to protect against any reference to Mr. Raiford's "identification" of Mr. Juluke. Counsel, therefore, failed to object to the testimony by Detective Tamborella and Detective Anthony Small about Mr. Raiford's "identification" of Mr. Juluke. The above error was compounded when Mr. Juluke's counsel failed to protect against Officer Felix's testimony about a police broadcast, which contained multiple layers of impermissible and highly prejudicial hearsay, violative of Mr. Juluke's rights under the Confrontation and Due Process Clauses.

Mr. Juluke's counsel further failed Mr. Juluke by not seeking severance and also by not arguing that the State had failed to prove that Mr. Juluke was with the co-defendants at the time of the alleged shooting, and that the jury should not hold it against Mr. Juluke if his co-defendants' alibi

---

[30] See, *Wade* hearing transcript, p. 4 at 7-8, wherein Raiford testified as follows:

Q. Who was the driver of the car?
A. I *think* it was Bernell.

witnesses failed to establish that they (Messrs. Gable and Nelson) were in another part of town at the time of the shooting.

**2. Suggestive Identification: The testimony about Mr. Raiford's "identification" of Mr. Juluke, that had been based on police suggestion, substantially affected Mr. Juluke's right to a Fair Trial.** Mr. Juluke's appointed counsel was absent for his *Wade* hearing, following which, the trial court refused to suppress reference to Mr. Raiford's out of court "identifications" of Mr. Juluke or the other defendants.

The state intermediate appellate court, on remand, summarily dismissed Mr. Juluke's complaint that suggestive identification evidence was used against him. It stated: "As discussed in this court's previous opinion, the identification was not suggestive *as to the other* defendants. The jury was aware that Mr. Raiford testified that he did not see Mr. Juluke during the drive-by shooting." See, *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 (4th Cir. 01/27/99)(on remand), at p. 4. (emphasis added).

However, because it entirely failed to assess whether the identification was suggestive *as to Mr. Juluke*, the appeal court's "analysis" "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." It also constituted an unreasonable application of the Due Process analysis to the out-of-court identification procedures in question.

At stake was whether Mr. Juluke had been properly "identified" by the sole eyewitness as being the driver of the car at the time of the shooting. Mr. Raiford confessed, ultimately, that he did not see the driver. In concluding that Mr. Juluke did not suffer any "actual prejudice" simply because the jury heard all of what Mr. Raiford had to say, the state court's analysis erred because it failed to consider the prejudicial effect of the earlier testimony by two police officers at trial that

-41-

Mr. Raiford had, indeed, "identified" Mr. Juluke, as well as Mr. Raiford's own earlier trial testimony

which suggested, at least at first, that he could, and indeed had "identified" Mr. Juluke. It also

wholly ignored evidence that Mr. Raiford's "identification" of Mr. Juluke had been impermissibly

suggestive, as the "identification" had been made, according to police, during a one-on-one display

of Mr. Juluke to Mr. Raiford, or according to Mr. Raiford's pre-trial testimony, by having Mr.

Raiford view all three (3) defendants together at police headquarters. Moreover, it further ignored

Mr. Raiford's testimony that the "identification" was made only after police first advised him that

Mr. Juluke had been caught with the co-defendants in a car that was stopped for a traffic violation.

Mr. Juluke's counsel, who first learned[31] of the improper suggestion only in the middle of trial, failed

to request a mistrial when Mr. Raiford finally admitted he did not actually see the driver-perpetrator.

However, that testimony came on the heels of repeated police testimony about Mr. Raiford's prior

"identification" of Mr. Juluke. It came too late to undo the first impression that had been made on

the jury.

　　　　Prior to Mr. Raiford denying that he could see the driver during the shooting, Detective

Tamborella [homicide detective] testified: "[H]e [Mr. Raiford] was transported to the homicide

---

[31] The state appeals court, on direct appeal, wrongly assumed that Mr. Juluke's attorney
had a transcript of the *Wade* hearing. There was no basis in the record for that assumption.
Indeed, a transcript of that hearing was only first transcribed by and obtained from the court
reporter, after trial, upon motion of undersigned counsel, which motion and order appears in the
State record. That motion would have been unnecessary if a transcript of the *Wade* hearing were
in the record. The unavailability of the *Wade* hearing transcript at trial is further borne out by the
fact that after Mr. Raiford testified about the color of the suspect vehicle, the parties had to take a
break from trial proceedings in order listen to the stenographer's audiotape of the prior hearing in
order to agree to a stipulation concerning the prior inconsistent testimony given by Mr. Raiford
at the *Wade* hearing. That stipulation further contained an error as to the date of the MOSI
hearing.

office. Mr. Raiford was secured in the robbery office adjacent to the homicide unit and the three (3) suspects were taken into a mirrored room which is located in the back of the homicide unit office, one at a time. And after each one was put in the room, Mr. Raiford was brought into that location and identified the subjects." See, Trial Transcript (02/27/96), at p. 24. Also, prior to Mr. Raiford's denial that he had seen the driver, Detective Anthony Small [who conducted the identification procedure] testified:

> "With Mr. Raiford, I had one subject come in at a time and Mr. Raiford was across the hall in the Robbery Division in a closed room. One subject – when I brought one subject into the mirrored room, I then proceeded to get Mr. Raiford. Took him to the glass, he viewed the person, that was the subject that was in the room. The first subject I brought in, his name was Bernell. I'm trying to think of his last name (pausing) - - Juluke. Mr. Raiford positively identified him as being one of the persons responsible for the shooting death of the victim. Mr. Raiford was then taken back to the Robbery Division and placed back in the room." Trial Transcript (02/27/96) at p. 59.

This police testimony made good on the prosecutors' opening statement in which he had said: "[T]hese three (3) individuals were arrested and taken down to the homicide office, where Mr. Raiford identified these three as being the individuals who were in the car firing the shots that killed Mr. Rondell Santinac." Transcript of State's opening statement, p. 3. It also made good on the opening statement given by Mr. Clyde Merritt, counsel for Mr. Leroy Nelson, who said: "[H]e [Mr. Raiford] shows up then, it's at police headquarters and three people are demonstrated to him and he says, yes, that is the three."

That repeated reference to Mr. Raiford's identification of Mr. Juluke swallowed Mr. Raiford's testimony at trial that the only persons he saw during the incident were Messrs. Nelson and Gable. More specifically, Mr. Raiford testified:

Q.     Did you recognize the people in the Baretta?

-43-

A.    Yes I did.
Q.    And who did you recognize, their names?
A.    Sidney - - Sidney and Kunta.

Testimony taken during trial on 02/27/96, Transcript, p.65.

It also swallowed this testimony, which was commenced when the prosecutor asked this

improper leading question which assumed facts not in evidence:

Q.    Did you get a look at Bernell when he was driving?
A.    No. I didn't.
Q.    Well, where did you get the idea that he had on a pajama top?
A.    When I went into that room to I.D. them one by one.

Trial Transcript (02/27/96) at p.73.

Thus, Mr. Raiford learned about the clothes defendants were wearing only at the police

headquarters; not during the shooting incident.  To assume that all taint of the suggestive

identification was purged when Mr. Raiford finally testified that he did not see the driver is to fail

to evaluate the totality of the available "identification" evidence.  On the whole, the truth concerning

Mr. Raiford's identification or non-identification of Mr. Juluke was not made clear.  Confusion

about the true facts provoked this questioning by Mr. Juluke's counsel:

Q.    And how are you so sure he was in the car that night?
A.    Because when I saw and I "I.D.'d" the other two and the man said he caught
      him when he got off the interstate and he was with them, so . . . ."

See, Trial Transcript (02/27/96) at p. 79.  Petitioner maintains that Mr. Raiford's "identification" of

him at police headquarters was the product of police suggestion and that all reference to those

"identification" procedures should have been suppressed.  Given the sequence of testimony at trial,

however, the only remedy was mistrial as to Mr. Juluke.

When a State so marshals its evidence at trial such that it has police officers testify about an

out of court identification made by a witness, before the witness himself testifies, the officers are testifying about hearsay. However, any violation of rights or evidentiary rules raised by that sequence, i.e. police first, identification witness second, are mooted if the witness, indeed, takes the stand and gives the same identification testimony. In that instance, both statements are cumulative and constitute substantive evidence of guilt.

Where, however, an eyewitness to a crime testifies that he could not, in fact, see or identify the defendant as a perpetrator only after the State first elicited police testimony that he could, the prior inconsistent statement (hearsay) is admissible only as "impeachment" evidence, not as substantive evidence of guilt.

Here, the State first introduced evidence, through police officer testimony, of Mr. Raiford's "identification" of Mr. Juluke at police headquarters, after which Mr. Raiford testified that he, indeed, did not see the driver of the car involved in the drive-by shooting. This sequence gave the false impression that Mr. Raiford was "recanting" his "identification." Mr. Raiford was effectively, but falsely, portrayed as a so-called "turncoat witness," i.e. a witness, "who makes a statement to the police implicating the defendant but then comes to trial and recants." See, *Dixon v. Snyder*, 2001 WL 1117462, at *3(C.A.7 (Ill.) 2001). The sequence of testimony concerning Mr. Raiford's "identification" of Mr. Juluke, especially in the absence of any safeguards or limiting instructions, allowed police testimony about Mr. Raiford's out of court identification of Mr. Juluke to be impermissibly imparted with *substantive* character, as opposed to simply constituting *impeachment* evidence.

The truth is that Mr. Raiford did not recant; he merely disclosed the police suggestion that led to his "identification" - - a point of law lost on the jury. It was a foul ball and the state judiciary

-45-

failed to get the call right. It falls to this Court to do so.

The error was compounded when the State introduced testimony about the police broadcast purporting to convey Mr. Raiford's out of court identification of Mr. Juluke as a perpetrator.

Not surprisingly, the trial judge (Judge Charles Ward), during the March 8, 1996 hearing on Mr. Juluke's post-trial motion for acquittal notwithstanding the verdict, expressed misgivings at the verdict in this case, and particularly wondered about Mr. Raiford's "identification" of Mr. Juluke. Questioning the prosecutor, Mr. Julian Parker, Judge Ward said:

> THE COURT: "Before arguing, Mr. Parker, one of the things that concerns me in reflecting upon the case was the identification of the three persons at the police headquarters. When the witness said he only observed two in the vehicle, he observed three but only could identify two, so I was wondering how did he identify three persons at police headquarters , if he did? All right, your turn to answer."

See, Transcript of March 8, 1996 hearing, p. 6.

The error in failing to suppress Mr. Raiford's "identification" of Mr. Juluke was further compounded by the State's failure to disclose the initial police report and police communication logs, which undermined Mr. Raiford's identification.

On collateral review of a state court conviction, a trial error is generally to be considered harmless if it did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

In *Kotteakos*, the Supreme Court explained this standard as follows:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights

-46-

were not affected. The inquiry cannot be merely whether there was enough to
support the result, apart from the phase affected by the error. It is rather, even so,
whether the error itself had substantial influence. If so, or if one is left in grave
doubt, the conviction cannot stand.

328 U.S. at 764-65, 66 S.Ct. 1239.

In *O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Court

confirmed that:

[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial
error of federal law had "substantial and injurious effect or influence in determining
the jury's verdict," that error is not harmless. And, the petitioner must win.

Id. at 436, 115 S.Ct. 992. The O'Neal Court explained that

[b]y "grave doubt" we mean that, in the judge's mind, the matter is so evenly
balanced that he feels himself in virtual equipoise as to the harmlessness of the error.
[ ] We conclude that the uncertain judge should treat the error, not as if it were
harmless, but as if it affected the verdict (i.e., as if it had a "substantial and injurious
effect or influence in determining the jury's verdict").

Id. at 435, 115 S.Ct. 992. "That is to say, if a judge has "grave doubt" about whether an error

affected a jury in this way, the judge must treat the error as if it did so." Id. at 438, 115 S.Ct. 992.

The principal factors to be considered in the determination of whether the erroneous

admission of evidence was harmless are "the importance of the witness's wrongly admitted

testimony, and the overall strength of the prosecution's case." *Wray v. Johnson*, 202 F.3d 515, 526

(C.A.2 (N.Y.) 2000); whether that testimony was material to the establishment of the critical fact or

whether it was instead corroborated and cumulative, see, e.g., *Brecht v. Abrahamson*, 507 U.S. at

639, 113 S.Ct. 1710; and whether the wrongly admitted evidence was emphasized in arguments to

the jury. See, *Brecht v. Abrahamson*, 507 U.S. at 639, 113 S.Ct. 1710; *Chapman v. California*, 386

U.S. 18, 25-26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The mere fact that the properly admitted evidence, standing alone, would have been sufficient to support the conviction is not determinative of whether the improperly admitted evidence had a substantial and injurious effect, see, e.g., *Moore v. United States*, 429 U.S. 20, 22, 97 S.Ct. 29, 50 L.Ed.2d 25 (1976); *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.") Here, moreover, not only was there improperly admitted evidence that had a substantial and injurious effect; the properly admitted evidence standing alone was insufficient.

Plainly, the State relied on the double hearsay of the police broadcast introduced through Officer Felix and suggested it proved Mr. Raiford had, indeed, identified Mr. Juluke. In the final closing argument of the case, prosecutor Mr. Julian Parker argued:

> ". . . I'm going to tell you that although he was only on the stand for a very short period of time, the critical witness in this case is Officer Tommy Felix. Remember him? He was in the uniform. He's in the Seventh District now.
>
> He was in the First District on August 22,1994 and they want to have you believe that when Samuel [Raiford] came in here in June of last year, July of last year a motion hearing and said something about turquoise and whether turquoise was in his vocabulary, I wasn't there in June. I don't know but when they talk about turquoise green, if he didn't tell the cops on the scene what the description was, what was Tommy Felix looking for? He told you he had his radio on. He got the description. See, this happened in the Fifth District. Felix worked in the First District. The description was broadcast to the First District where Felix heard it. He said, we were targeting something. Even one of their witnesses came up here and said a traffic stop. That was no traffic stop. He had a target. His target was this car right here. That is Felix's target. He was by himself. He had a target. The target he got form the dispatcher. The dispatcher got it from the Fifth District. The Fifth District got it from Sam Raiford. Turquoise green, motion hearings? That boy don't know what a motion hearing is. But he knows what he saw. Now, let me clear something else up for you.

> * * *

> . . . Make this the Tommy Felix trial. The man went out there and said, hey, man, you scared me. When the dispatcher called Juluke's name over the air after he had just

-48-

told him his name and he said, what's your name? Uh, uh, something, something –
oh, man. You scared me there for a minute. Felix didn't know what he had."

See, Transcript of Closing Statement, at p. 86-88. Thus, "the wrongly admitted evidence was emphasized in arguments to the jury," in violation of *Brecht v. Abrahamson*, supra.

The proposition that the prejudicial value of testimony about Mr. Raiford's identification of Mr. Juluke was neutralized by the totality of Mr. Raiford's testimony rings hollow in light of the prosecutor's closing argument emphasizing Officer Felix's reference to the police broadcast, implying Mr. Raiford's on the scene identification of Mr. Juluke as the impetus for Mr. Juluke's "change of name." This implication is all the more unfair given that Mr. Juluke established at his post-conviction hearing that no police broadcast occurred during Officer Felix's traffic stop interview of Mr. Juluke.

The "identification" testimony of Mr. Raiford clearly bore on an essential issue, the identity of the driver-perpetrator. And that testimony was crucial to the prosecution's case because the State presented no other evidence tying Mr. Juluke to the shooting. It is hardly surprising, therefore, that in its summation, the prosecution emphasized the police broadcast which contained the multiple hearsay suggesting that Mr. Raiford had "identified" Mr. Juluke. As to the identity of the driver-perpetrator, the State presented nothing else. There was no physical evidence offered to identify Mr. Juluke as the driver. No fingerprints had been gathered from the bullets recovered at the scene. The only evidence presented was the circumstantial evidence that Mr. Juluke was stopped for a traffic violation at least twenty-three (23) minutes after the shooting in a vehicle with co-defendants. The error in admitting suggestive and hearsay identification testimony cannot be termed harmless.

During closing argument, Mr. Juluke's counsel, who had missed the *Wade* hearing, did not

understand, thus could not explain the reason for Mr. Raiford's inconsistency. That left the jury free to draw this logical conclusion: that Mr. Raiford's recantation at trial was not credible. The state courts never acknowledged that the jury made that false inference. The state court's refusal to do so was an unreasonable determination of the facts.

The above error was compounded by the State's disclosure failures. Had the jury known that Officers Davis and Williams had written in their police report that the three perpetrators were "unknown" even after they had spoken with "the" witness, and that the police communication logs would not corroborate that police had been given all three names and clothing descriptions for the perpetrators - - indicating that Mr. Raiford, indeed, did not see any of the defendants commit the drive-by shooting -- Mr. Raiford's trial recantation, as well as the recantations he had made out of court to defense witnesses, would have been more credible. The initial police report and police communication logs would likely have added "substance and credibility" to Mr. Raiford's trial testimony that he did not see Mr. Juluke commit the crime, "not to mention that an in-court statement is typically entitled to greater weight than an out-of-court statement" [see, *Dixon v. Snyder*, 2001 WL 1117462, *10 (C.A.7 (Ill.) 2001)] such as the station house identification statement. Moreover, if Mr. Raiford's station house identification had not come in as substantive evidence, there would have been no direct evidence--and only very slim circumstantial evidence--connecting Mr. Juluke to the murder.

Mr. Juluke's counsel's failure and/or inability to protect against the suggestive identification and hearsay resulted, in part, from his failure to obtain and/or the State's failure to disclose, the initial police report and the police communication logs. Those documents which came to light only during state post-conviction proceedings, constituted *Brady* and/or *Giglio* impeachment evidence.

-50-

The Louisiana Supreme Court failed to find that the prosecutor violated his disclosure obligations. In so holding, it failed to discuss the post-conviction evidence that the infamous Officers Davis and Williams were the source of information contained in the police broadcast, and that only uncorroborated hearsay supported the inference that Mr. Raiford had identified Mr. Juluke. The state court thus failed to accord appropriate weight to the complete body of available evidence pertinent to Mr. Juluke's *Brady/Giglio* and ineffective counsel claims.

**3. Suppression of Exculpatory and Impeachment Evidence**. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Materials which could have helped defense suggest an alternative perpetrator, or impeach prosecution witnesses, are *Brady* material. See, *Boyette v. Lefevre*, 246 F.3d 76 (C.A.2 (N.Y.) 2001).

Several well-established propositions guide a materiality analysis. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, the court must determine whether, in the absence of the undisclosed evidence, the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Second, the "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35, 115 S.Ct. 1555. Third, "once a reviewing court ... has found constitutional error, there is no need for further harmless-error review." *Id.* at 435, 115 S.Ct.

-51-

1555. Fourth, the reviewing court must consider the suppressed evidence "collectively, not item by item." *Id*. at 436, 115 S.Ct. 1555.

Here, the prosecutor did not disclose the initial police report and police communication logs ("logs") to the defense. These documents were, both individually and cumulatively, important to this case which centered around a purported identification made by a sole eyewitness. The prejudicial effect of non-disclosure of this material was: (1) to deprive defense counsel of an opportunity to test the eye-witness' credibility, (2) to suggest alternative perpetrators, i.e., police Officers David and Williams (killer cops), or their agents, Mr. Russell Spurlock (owner of the Baretta), Mr. Izell Henderson (as borrower of the Baretta) or Mr. Pernell Mays, name on police communication logs, and (3) to impeach other prosecution witnesses. Mr. Juluke, indeed, presented a valid *Brady* claim.

The intermediate appellate court's analysis of these claims, affirmed by the Louisiana Supreme Court without further opinion, failed to consider all evidence, including that adduced at trial and on post conviction, and contained a factual error. The Court accepted that the documents had not been disclosed to the defense, but found that no prejudice resulted. It reasoned:

> Mr. Juluke maintains that there was a *Brady* violation because the State did not turn over the initial police report of Officers Len Davis and Sammie Williams in which contained exculpatory evidence because they reported that Mr. Raiford could not identify the perpetrators. As previously noted in this court's original opinion, officers Davis and Williams were the first to arrive at the scene of the shooting. Their report did not contain the names of the perpetrators *as Officers Davis and Williams did not interview the witness Mr. Raiford.* Homicide detectives were the officers who interviewed the witness Mr. Raiford. Mr. Juluke was not prejudiced by not having the initial police report.
>
> This Court has reviewed the claim that Mr. Juluke was prejudiced because his attorney did not secure the police data systems' communication sheet, which would have established the exact time of the murder, and information of the 911 call. Trial

-52-

evidence established the events surrounding the shooting. Mr. Juluke does not show how he was prejudiced by not having the police communication sheet.

See, *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 (4th Cir. 04/30/99)(on rehearing), at p. 2. [Emphasis added].

That "analysis" of Mr. Juluke's *Brady* claims "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Having gotten the facts adduced at trial wrong, and having given no consideration to the facts adduced on post-conviction, which undermined the state Supreme Court's factual assumptions, the state courts were led to the wrong conclusion concerning prejudice from the non-disclosures.

Applying the *Kyles* principles, the state court's conclusion that Mr. Juluke was not prejudiced by the non-disclosures constitutes an objectively unreasonable application of Supreme Court precedent to the facts of this case. First of all, it is hard *ab initio* to even determine which premise this Court should start with. Did the non-disclosures bear on the State's "identity" case against Mr. Juluke, that is, should we assume that Mr. Raiford did identify Mr. Juluke such as that the State, indeed, had an "identity" case against Mr. Juluke?

Or should the non-disclosures be assessed as bearing on the circumstantial evidence case against Mr. Juluke, and did that circumstantial case consist only of the following elements: that Mr. Juluke was stopped driving a suspect car at least twenty-three (23) minutes after Mr. Santinac was shot; that Messrs. Nelson and Gable were in the car at the time of the traffic stop; that Mr. Raiford positively identified Messrs. Nelson and Gable as the shooters; and that Mr. Raiford had, at some time prior to the shooting, seen all three (3) defendants, along with many others, embroiled in some argument or fight in the Iberville Housing Project.

The non-disclosure of the communication logs which undermine Officer Felix's testimony that while interviewing Mr. Juluke during a traffic stop, Mr. Juluke heard the broadcast of a perpetrator's name and attempted to "change his name" obviously resulted in prejudice. Moreover, Officer Felix's testimony about the "broadcast" is otherwise exceedingly problematic, assuming the truth of Mr. Raiford's testimony that he did not see the driver-perpetrator nor Mr. Juluke at the time of the shooting. Officer Felix's testimony was particularly critical because the police repeatedly testified that Mr. Raiford had identified Mr. Juluke as a perpetrator and the State suggested that Mr. Raiford was the root source of a police broadcast containing the perpetrator or perpetrators name(s).

The non-disclosure of the exact chronology and sequence of events as revealed by the police radio communications was also critical, as it bore on the length of time between the shooting and the traffic stop and whether a suspect's name was, indeed, broadcast during Officer Felix's traffic interview of Mr. Juluke.

The undisclosed police communication logs also prove that the first officers to arrive at the scene of the shooting were Officers Davis and Williams, two officers who were indicted on federal charges linked to murders and cover-ups and who did not testify at Mr. Juluke's trial. The initial police report, authored by Officers Davis and Williams, suggests they located a witness, presumably Mr. Raiford, yet further memorializes that the three perpetrators were "unknown," as the state court acknowledged.

Additionally, the undisclosed logs adduced at the state post-conviction hearing memorialize that in a police radio broadcast emanating from Davis and Williams, a perpetrator was identified as "Pernell Mays" and that he was reportedly traveling in a blue Chevrolet Baretta. The logs thus prove that the state intermediate court got two important facts wrong. Officers Davis and Williams,

-54-

indeed, not only interviewed Mr. Raiford, they were the only police who radioed information about the suspect vehicle and perpetrators to the police dispatcher, who put out the broadcast that led to the police detaining of the defendants. They also establish that there was no broadcast of a perpetrator's name while Mr. Juluke was being interviewed by Officer Felix, contrary to Officer Felix's testimony.

The defense was obviously hampered by not having the initial police report and communication logs. Without them, the defense could not accurately nail down the length of time that elapsed between the shooting and the traffic stop, nor could they nail down the information attributed to Mr. Raiford before the impermissible police suggestion took place. With the logs, the defense could contradict Officer Felix's testimony that there was a police broadcast of a perpetrator's name while he was interviewing Mr. Juluke. So there was no factual foundation for the "change of name" testimony.

Detective Tamborella testified at trial that a verbal statement had been taken at the scene of the crime from Mr. Raiford and that Mr. Raiford gave a description of the perpetrators, including their clothing descriptions. See, Trial Transcript on (02/27/96) at p. 23.

On cross-examination by Clyde Merritt (Leroy Nelson's attorney), Detective Tamborella testified as follows:

> Q. Now, 9:50. [which was after the arrests] Maybe you're talking to Samuel Raiford?
> A. Yes, sir.
> Q. At that time you didn't ask him for a description of the parties or a description of the car or anything?
> A. No, sir, I did not.
> Q. Would you tell the members of the jury the first man in charge, homicide officer in charge of homicide, the first time you investigated and you don't ask him anything? So you can put over the air the description of the

-55-

individuals?

A.   No, I did not.

Q.   Is that normal homicide procedure?

A.   Yes, sir. The transmission is done properly. *The notification was made before my arrival and I had no reason to question the officers who made, already made the transmission.*

Q.   But that's what I said. You knew he already had said he didn't know anyone who did it?

A.   No, sir. *The identification was put out over the air.* He had to know who he was or they wouldn't have put the information on the police radio.

Q.   That wasn't Pernell Mays - -

A.   Yes, sir. He identified him as the driver.

Trial Transcript (02/27/96) at p. 35-36.

The defense could have contradicted and impeached Detective Tamborella's testimony about the information purportedly told Officers Davis and Williams by Mr. Raiford if they had only had the report authored by these officers who recorded that although they located a witness, the three (3) perpetrators remained "unknown." Moreover, the defense could have contradicted and impeached Detective Tamborella's testimony and Officer Felix's testimony with the police communication logs, because the logs nailed down the time between the shooting and the traffic stop, as well as the fact that the police broadcast did not contain three (3) perpetrators names, nor any clothing descriptions, and showed that there was <u>no</u> police broadcast of a perpetrator's name during the traffic stop.

It was not equivalent that Detective Tamborella admitted at trial that indeed, at some stage in the investigation, police were searching for a subject known as Mr. Pernell Mays in a blue Chevy Chevette, and that Mr. Pernell Mays, who had been "identified as another subject" was never located. See, Trial Transcript (02/27/96) at p. 31.

With the initial police report and police communication logs in hand, the defense counsel could have argued more plausibly that Mr. Raiford did not see <u>any</u> of the perpetrators; he did not

-56-

give their names or clothing descriptions to the police, contrary to police testimony; and that all testimony about the perpetrators was sourced to rogue police officers Davis and Williams, who had been involved in murders and cover-ups.

**3. The Hearsay and Confrontation Clause violations: testimony about a police broadcast substantially affected Mr. Juluke's Due Process right to a Fair Trial.** The United States Supreme Court has recognized that in-court testimony about out-of- court statements (hearsay) is objectionable because it leads the jury to "improperly infer both that the out of court statement had been made *and* that it was true." *Pointer v. Texas*, 380 U.S. 400, 419. [Emphasis added].

The hearsay rule should prevent a witness from testifying about what a non-testifying witness allegedly heard. In this case, Officer Felix testified that he heard a police broadcast which contained the perpetrator's name. At the state post-conviction proceeding, it was proved that the source of broadcast was Officers Davis and Williams, in Unit 518, who supposedly told the police dispatcher about what Mr. Raiford told Officers Davis and Williams. Officers Davis and Williams did not testify. Thus, Officer Felix testified about what non-testifying witnesses (Davis and Williams) allegedly heard from Mr. Raiford, who ultimately denied that he saw Mr. Juluke behind the wheel during the shooting.

Mr. Juluke maintains that he could not effectively exercise his right to cross-examination and confrontation on the factual question whether Officers Davis and Williams, indeed, actually heard Mr. Raiford identify Mr. Juluke – the statement Officer Felix effectively related when he told the jury he heard a police broadcast containing Mr. Juluke's name. The possibility was not wholly unreal that adept cross-examination of Davis and Williams or even of Mr. Raiford, with the proper documents in hand, would have shown that Mr. Juluke's connection to the murder was based purely

-57-

on conjecture and thus, at bottom, was unreliable.

The Louisiana Supreme Court has never discussed Mr. Juluke's objection to testimony about the police broadcast based on it being hearsay violative of his confrontation rights, as well as his Due Process rights to a Fair Trial. The intermediate appellate court had reasoned that testimony about the police broadcast was not hearsay because, in their view, it was "not offered to prove the truth of the matter asserted but to show the situation in which the change of names occurred." *State of Louisiana v. Juluke*, Slip Opinion, No. 96-KA-1920 (4th Cir. 4/30/99)(on rehearing) at p. 4. Given the evidence adduced upon post-conviction, the appellate court was clearly wrong.

Testimony about the police broadcast did, indeed, constitute inculpatory hearsay evidence offered by the prosecution to prove the truth of the matter asserted. This testimony improperly inculpated Mr. Juluke in two senses. First, it suggested that Mr. Juluke's name, indeed all three suspects' names, had somehow been given to police. Second, if the jury concluded that Mr. Juluke, indeed, had changed his name upon hearing the broadcast of the suspect or suspects' names, the supposed "change of name" showed consciousness of guilt.

The admission of the testimony about the broadcast harmed Mr. Juluke by limiting the defense's ability to rely on Mr. Raiford's ultimate disclaimer of having seen Mr. Juluke commit this murder. The harm was compounded because the State did not call as witnesses, Officers Davis and Williams, who were responsible for putting out the broadcasts. Mr. Juluke could not cross-examine these officers concerning their involvement and whether Mr. Raiford in fact made the statement, or about any tentativeness in the information, if any, that Mr. Raiford first told police about the suspects before defendants were stopped for the traffic violation.

Because Officers Davis and Williams were not witnesses at trial, the inference arising from

-58-

Officer Felix's reference to the police broadcast referencing Mr. Raiford's statement identifying Mr. Juluke and the other perpetrators could not be tested by cross-examination. Similarly, Mr. Raiford could not be cross-examined on a statement imputed to, but not admitted, by him. See *Dutton v. Evans*, 400 U.S. 74, 85, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

The evidence addressed during post-conviction that indeed, no broadcast of Mr. Juluke's name occurred during the traffic stop revealed the pretext and pure fiction in the State's assertion that the broadcast was admissible to show the circumstances of a change of name and establishes Mr. Juluke's consciousness of guilt.

**4. Insufficient Evidence to Convict.** On direct appeal, the State Supreme Court's sufficiency of evidence determination was unreasonable insofar as it misapprehended whether a procedural bar existed to appeal counsel's argument concerning the possibility of a switch of drivers. Its sufficiency of the evidence determination was unreasonable also on post-conviction because it failed to evaluate the totality of the evidence--both that adduced at trial, as well as the evidence adduced in the habeas proceeding.

A unanimous panel of the Louisiana Fourth Circuit Court of Appeal thought the evidence against Mr. Juluke (even before some elements of the state's case were successfully undermined on post-conviction) was insufficient to meet the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, so it would be proper for this Court to assume the question is close in examining whether the Louisiana Supreme Court's decision was an "unreasonable application of" the *Jackson* standard. See, *Hurtado v. Tucker*, 245 F.3d 7, 16 (C.A.1 (Mass.) 2001).

The Louisiana Supreme Court appears to have concluded that Mr. Juluke's argument concerning insufficiency of the evidence was procedurally barred as a matter of Louisiana law to the

extent Mr. Juluke was arguing an hypothesis of innocence on appeal that had not been argued to the jury, namely, that the evidence did not exclude the possibility of a switch in drivers of the suspect vehicle during the interim after the shooting and before Mr. Juluke was stopped for a traffic violation. See, *State v. Juluke*, 725 So.2d 1291, 1293 (La. 1999). In articulating that supposed procedural bar, the Louisiana Supreme Court specifically cited *State v. Captville*, 448 So.2d 676, 680 (La. 1984) as evidence that Louisiana, indeed, had such a procedural rule requiring the defendant to argue all hypothesis of innocence at trial or risk procedurally defaulting the claim.

But a review of Louisiana case law, however, fails to support the conclusion that there was a well-established state procedural rule as of the time that Mr. Juluke's conviction was reviewed on direct appeal, which barred appellate review of whether the evidence was sufficient to exclude every reasonable hypothesis of innocence, where the specific hypothesis of innocence argued on appeal was not argued to the jury. To the contrary, Louisiana's statutory law expressly provides as follows:

> "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

La. Rev. Stat. 15:438. There is no statutory provision requiring all hypotheses of innocence to be argued at trial. Thus, especially where a claim is made that trial counsel was "ineffective" in failing to argue a reasonable hypothesis of innocence, there is no support for concluding that the claim has been procedurally defaulted under Louisiana statutory law.

Moreover *Captville* is utterly insufficient to demonstrate the existence of a state procedural rule that is so "firmly established and regularly followed" that it may bar a petitioner's federal constitutional claim on collateral review. *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (explaining that an adequate and independent state procedural bar to the

-60-

consideration of "constitutional claims must have been 'firmly established and regularly followed' by the time as of which it is to be applied") (citing *James v. Kentucky*, 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984)).

First, Louisiana is a civil law jurisdiction, not a common law jurisdiction. The Louisiana Supreme Court has given the following justification for its ignoring its own precedent:

> The Civil Code establishes only two sources of law in Louisiana: legislation and custom. See La. Civ. Code art. 1. Within these two categories, legislation is superior to custom and will supercede it in every instance. See La. Civ. Code art. 3. Judicial decisions, on the other hand, are not intended to be an authoritative source of law in Louisiana. See A.N. Yiannopoulos, Louisiana Civil Law System § 35, p. 53 (1977). Consequently, Louisiana courts have frequently noted that our civilian tradition does not recognize the doctrine of stare decisis in our state.
> 
> &ast; &ast; &ast;
> 
> Because of the fact that "one of the fundamental rules of [the civil law tradition] is that a tribunal is never bound by the decisions which it formerly rendered: it can always change its mind," 1 Marcel Planiol, Treatise on the Civil Law § 123, (La. State Law Inst. trans.1959) (12th ed.1939), prior holdings by this court are persuasive, not authoritative, expressions of the law. See Yiannopoulos, supra, at § 35, p. 54. Thus, it is only when courts consistently recognize a long-standing rule of law outside of legislative expression that the rule of law will become part of Louisiana's custom under > Civil Code article 3 and be enforced as the law of the state. See La. Civ.Code art. 3.

*Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 128 (La. 2000)(some citations omitted).

Secondly, in *Captville*, the defendant took the witness stand and testified. In affirming his conviction, the Louisiana Supreme Court said this:

> "When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence *presented by the defendant's own testimony*, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. As we have recognized in such cases as *State v. Wright*, 445 So.2d 1198 (La.1984), *State v. Graham*, 422 So.2d 123 (La.1982), and *State v. Sutton*, 436 So.2d 471 (La.1983), the court does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an

exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not "have found proof of guilt beyond a reasonable doubt."

*Captville*, 448 So.2d at 680. [Emphasis added].

Thus, not only do the holding and reasoning of *Captville* fail to bar appellate review of whether the evidence was sufficient to exclude every reasonable hypothesis of innocence where the specific hypothesis of innocence argued on appeal was not argued to the jury, they in fact compel a court to engage in an analysis "whether the alternative hypothesis is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'"

Moreover, even if *Captville* supported the proposition that in certain cases the Louisiana Supreme Court will ignore an hypothesis of innocence offered for the first time on appeal, Mr. Juluke's case is easily distinguishable from *Captville*. In *Captville*, the defendant (the only witness to the victim's death) testified as to his version of events leading to the victim's death. The jury obviously rejected his testimony. Under those circumstances, arguably the Louisiana Court was not required on appeal to consider a version of how the death occurred that was adverse to defendant's own trial testimony. Here, however, Mr. Juluke did not testify at trial. Rejection of the co-defendants' alibi witnesses' testimony does not free the court from considering an hypothesis of innocence that puts someone other than Mr. Juluke behind the wheel of the suspect car at the time of the shooting. In other words, where an alleged eyewitness states that the two co-defendants were the shooters involved in a drive-by shooting, but where testimony by alibi witnesses places the co-defendants or Mr. Juluke in another part of town at the time of the shooting, it does not follow that rejection of co-defendants' alibi witnesses constitutes affirmative evidence that Mr. Juluke was with

the co-defendants at the scene of the shooting.

Because it must be concluded that there was no firmly established and regularly followed state procedural rule to bar Mr. Juluke's sufficiency of evidence claim when the Louisiana Supreme Court reviewed this case, this Court can reach the substance of Mr. Juluke's claim. See, *Mitchell v. Mason*, 257 F.3d 554, 563 (C.A.6 (Mich.) 2001).

It has been said[32] that "*Williams* suggests the following guidelines as to some, but not all, of the principles in an insufficiency-of-the-evidence case to be used in making the evaluation of "objective unreasonableness" under § 2254(d)(1):

(1) The focus of the inquiry is on the state court decision;

(2) Even with the deference due by statute to the state court's determinations, the federal habeas court must itself look to "the totality of the evidence" in evaluating the state court's decision;

(3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;

(4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and

(5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness."

In *Williams*, the operation of these principles meant that a writ of habeas corpus should issue.

On the facts here, the operation of those principles means that a writ of habeas corpus should also issue.

On direct appeal, the Louisiana Supreme Court had to make certain assumptions outside the

---

[32] *Hurtado v. Tucker*, 245 F.3d 7, 18 (C.A.1 (Mass.) 2001).

record concerning the elements of the State's circumstantial evidence case against Mr. Juluke. Those

assumptions were as follows:

(1) That the time between the shooting and the traffic stop could have been as short as ten to fifteen (10-15) minutes. See, *State v. Juluke*, 725 So.2d 1291, 1294 (La. 1999).

(2) That Mr. Juluke uttered inconsistencies concerning his name when speaking with Officer Felix during a traffic after overhearing a police broadcast. See, *State v. Juluke*, 725 So.2d 1291, 1294 (La. 1999).

(3) That the first officers at the scene of the murder, Officers Len Davis and Sammie Williams, wrote "unknown" in their police report concerning the perpetrators' names simply because they "did not interview the witness Mr. Raiford." See, *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 at p. 2 (4th Cir. 4/30/99)(on remand from Louisiana Supreme Court, and on rehearing).

(4) That any hearsay content in the police broadcast was not offered to prove the truth of the matter asserted (i.e. that petitioner was a perpetrator) and was necessary (and outweighed any undue prejudice) because it simply showed the situation in which a change of name allegedly occurred. See, *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 at p. 4(4th Cir. 4/30/99)(on remand from Louisiana Supreme Court, and on rehearing).

(5) That petitioner cannot show that he was prejudiced by not having the police communication logs. See, *State v. Bernell Juluke, Jr.*, Slip Opinion, No. 96-KA-1920 at p. 3 (4th Cir. 4/30/99)(on remand from Louisiana Supreme Court, and on rehearing).

(6) That information on the police communication logs did not constitute exculpatory and/or impeachment evidence.

However, during post-conviction proceedings, Mr. Juluke adduced evidence undermining

the above assumptions. He provided clear and convincing evidence that:

● No less than twenty-three (23) minutes elapsed between the time of the shooting and the traffic stop of the suspect vehicle;

● There was no police broadcast of petitioner's name during a traffic stop, contrary to what was maintained at trial;

● Police were not furnished with the names of all perpetrators and their clothing descriptions prior to the traffic stop of the suspect vehicle;

• Officers Davis and Williams indeed were the officers who first interviewed Mr. Raiford at the scene of the murder, and that all information about the perpetrators that was broadcast on the police radio emanated from Officers Davis and Williams.

The totality of the evidence adduced at trial and on post-conviction showed that the State's circumstantial case against Mr. Juluke consisted only of these facts: that Mr. Juluke was arrested in the company of co-defendants in a gray Chevrolet Baretta just outside the Bienville Housing Project, located just outside the French Quarter in New Orleans. Prior to his arrest, police had been looking for a blue Chevrolet Baretta involved in a drive-by shooting that was committed at least twenty - three (23) minutes[33] earlier in the Desire Housing Project, located on the eastern outskirts of the city. An eyewitness to the crime positively identified the co-defendants as the two shooters that committed the drive-by shooting. The eyewitness, however, gave conflicting testimony concerning his "identification" of Mr. Juluke. At best, his identification appears to have been based on conjecture and to have been tainted by police suggestion which informed Mr. Raiford that Mr. Juluke had been apprehended after the shooting in the car with the co-defendants. After testimony about his "positive" identification of all three perpetrators, Mr. Raiford eventually disclosed that he could not, in fact, see the driver or car color during the shooting, and that after being told by police that Mr. Juluke was "caught" with Messrs. Gable and Nelson, it appears that Mr. Raiford speculated that Mr. Juluke was a perpetrator simply because he had seen Mr. Juluke, as well as a great many other people, sometime earlier before the shooting in another housing project with the co-defendants. Mr. Juluke called no witnesses to the stand, although he did cross-examine the alibi witnesses who were

---

[33] The police communication logs, Mr. Juluke established during state post-conviction proceedings that there had been at least 23 minutes between the time the police first received a 911 phone call reporting the shooting and the time Officer Felix first spotted Mr. Juluke in a vehicle.

called to the stand by one of the co-defendants. The jury, which was deprived of the police communication logs and initial police report of Davis and Williams, rejected the co-defendants' alibi.

In rejecting the hypothesis of innocence offered on appeal, i.e. a switch in drivers between the time of the shooting and the time of Mr. Juluke's arrest, the Louisiana Supreme Court placed too much emphasis on the alibi witnesses who attempted to place the co-defendants and the gray Chevrolet Baretta at some other part in the city at the time of the shooting. The jury rejected the alibi, i.e. the jury did not believe that defendants were altogether in a different part of the city at the time of the shooting. However, the rejection of that alibi testimony does not constitute positive substantive proof of the reverse inference, i.e. that all of the defendants were together at the time and place of the shooting.

At bottom, the State's case lacked proof positive excluding the reasonable hypothesis that at the time of the shooting, someone other than Mr. Juluke was driving the suspect vehicle. There were no rifles recovered from the car at the time of Mr. Juluke's arrest. The bullets recovered from he scene did not contain any fingerprints. The car in question did not belong to Mr. Juluke and the car's owner, Mr. Russell Spurlock, testified that he had loaned it earlier in the day to another person, Mr. Izell Henderson. Mr. Henderson confirmed that he had borrowed the car from Mr. Spurlock and that he, indeed, was using the car at the time of the shooting to give his girlfriend a ride from work. Both Messrs. Spurlock and Henderson were nearby the scene of Mr. Juluke's arrest and testified the car was loaned to Mr. Juluke only moments before his arrest. Indeed, Mr. Henderson testified that he had instructed Mr. Juluke to take the car to go get something to eat just before learning that police had stopped Mr. Juluke just outside the Bienville Housing Project, within eyesight of Mr. Spurlock,

who walked over to the scene of the arrest and inquired about getting back possession of his car.

Moreover, during post-conviction proceedings, Mr. Juluke discovered the initial police report that indicated that former New Orleans Police Department Officers Davis and Williams had memorialized on their police report that they had located a witness and that the three perpetrators were "unknown." Police communication logs adduced at the post-conviction hearing indicate that all information related by police over the police dispatcher, which led to the defendants' arrest, emanated from Officers Davis and Williams, and failed to confirm that the police had been given the names and clothing descriptions of the three defendants prior to the traffic stop that preceded their arrest, contrary to trial testimony.

## CONCLUSION

The great writ should issue in this case.

SUTTERFIELD & WEBB, L.L.C.

CHARMAGNE A. PADUA (#10272)
Suite 2715, Poydras Center
650 Poydras Street
New Orleans, LA 70130-6111
(504) 596-2453
**ATTORNEYS FOR BERNELL J. JULUKE, JR.**