

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

BERNELL JULUKE, JR.                          CIVIL ACTION

VERSUS                                       NO. 02-3582

BURL CAIN, WARDEN LOUISIANA                  SECTION "H"
STATE PENITENTIARY at ANGOLA

### ORDER AND REASONS

Bernell Juluke's motion for post-conviction relief pursuant to 28 U.S.C. §2254 was considered on memoranda. Upon review of the entire state court record, it is clear that the record is sufficient for the purpose of adjudicating petitioner's claims, that a federal evidentiary hearing is not necessary, and that the petition should be dismissed for the following reasons.

Juluke is a state prisoner who was convicted, following a jury trial, of one count of second degree murder (La. Rev. Stat. 14: 30.1) and sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence. Petitioner appealed his conviction, asserting a number of errors. The state court of appeals reversed petitioner's conviction after concluding that there was insufficient evidence to support his conviction. *State v. Gable*, No. 96-KA-1920, 704 So.2d 995 (Table) (La. App. 4th Cir. January 21, 1998). The appellate court did not address petitioner's other asserted grounds of error. The state appealed; the Louisiana Supreme Court



DATE OF ENTRY

JAN 2 6 2004

___ Fee_____
___ Process____
X  Dktd_____
___ CtRmDep____
___ Doc. No_____

reversed the court of appeals, reinstated Juluke's conviction and sentence, and remanded the case to the court of appeals for consideration of petitioner's remaining assignments of error. *State v. Juluke*, 725 So.2d 1291 (La. 1999). Juluke filed an application for rehearing; however, before the Louisiana Supreme Court ruled on the application for rehearing, the state court of appeals, on remand, affirmed the conviction. *State v. Juluke*, No. 96-KA-1920, 735 So.2d 142 (Table) (La. App. 4th Cir. January 27, 1999). Shortly thereafter the Louisiana Supreme Court denied petitioner's application for rehearing. *State v. Juluke*, No. 98-K-0341 (La. February 12, 1999). Petitioner then filed an application for rehearing with the state court of appeals; the court granted petitioner's application for rehearing and affirmed his conviction. *State v. Juluke*, No. 96-KA-1920 (La. App. 4th Cir. April 30, 1999). The Louisiana Supreme Court denied writs. *State v. Juluke*, 748 So.2d 466 (La. 1999).

Once his conviction was final, petitioner filed a petition for *habeas corpus* relief in the state district court. The state district judge conducted an evidentiary hearing and then denied relief. *State v. Juluke*, No. 372-656 (Orleans Parish Criminal District Court July 23, 2001). The state court of appeals and the Louisiana Supreme Court denied writs. *Juluke v. Burl Cain*, No. 2001-K-1765 (La. App. 4th Cir. November 8, 2001); *State v. Juluke*, 825 So.2d 1190 (La. 2002).

Juluke seeks to vacate his conviction and sentence on the following grounds:

- the absence of counsel during a portion of a hearing on petitioner's motion to suppress was *per se* prejudicial;

- the admission of a tainted identification by the sole eye witness denied petitioner a fair trial;

- the state violated petitioner's right to confront the witnesses against him by failing to call Officer Len Davis as a witness;

2

- the state failed to disclose exculpatory and impeachment evidence thereby depriving petitioner of a fair trial; and

- there was insufficient evidence to support the conviction.

Although the state contends to the contrary, I conclude that petitioner has raised all of these claims in the proceedings described above. Therefore, he has exhausted the available state court remedies. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Dupuy v. Butler,* 837 F.2d 699, 702 (5th Cir. 1988).

## TIMELINESS

The state asserts that Juluke's application for post-conviction relief is time-barred pursuant to 28 U.S.C. §2244. The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996)(AEDPA), amended 28 U.S.C. §2244 to establish a one-year limitation period for filing a federal *habeas corpus* petition. Title 28 U.S.C. §2244(d) provides in pertinent part:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> . . .
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Under §2244 petitioner had 365 days after his conviction became final to file his petition for federal *habeas corpus* relief, tolled only for the days on which a "properly filed" application for state

3

*habeas* relief was pending.  Petitioner's conviction became final on January 14, 2000, when the 90

day period for seeking a writ of *certiorari* from the United States Supreme Court expired following

the Louisiana Supreme Court's denial of petitioner's application for supervisory writs.  *See Ott v.*

*Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

Petitioner allowed 206 days of the limitation period to elapse between January 14, 2000 and

August 7, 2000, the date the state concedes petitioner filed his  first application for state *habeas*

*corpus* relief.  Because that *habeas*  application was "properly filed," it remained "pending" for

purposes of §2244 until it "achieved final resolution through the State's post-conviction procedures."

*Carey v. Saffold*, 536 U.S. 214, 220, 122 S.Ct. 2134, 2137-38, 153 L.Ed.2d 260 (2002).  The

Louisiana Supreme Court resolved the state *habeas* application on September 30, 2002, when it

denied Juluke's application for supervisory writs.  The state *habeas*  application therefore tolled the

§2244 limitations period from August 7, 2000 until September 30, 2002.

After the Louisiana Supreme Court denied petitioner's application for supervisory writs, an

additional 65 days elapsed before Juluke filed this petition for federal post-conviction relief.  Thus,

only 271 days ( 206 days plus 65 days) of the 365 day limitation period elapsed between the date

petitioner's conviction became final and the date he filed this application for federal *habeas* relief.

Accordingly, the petition is timely.

STANDARD OF REVIEW

28 U.S.C. § 2254(d) mandates that claims adjudicated on the merits in state court

proceedings are subject to the following standards of review:

> (d) An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was

4

adjudicated on the merits in State court proceedings unless the
adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established Federal law,
as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding.

In *Drinkard v. Johnson*[1] the Fifth Circuit Court of Appeals analyzed the standards of review

set out in §2254(d) and held that when reviewing questions of fact which were previously

adjudicated on the merits by a state court, a federal court may grant habeas relief only "if the state

court adjudication of the claim 'resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence.'" *Id.* (citing 28 U.S.C. § 2254(d)(2)).  As for

questions of law, "a federal court may grant *habeas* relief only if it determines that a state court's

decision rested on a legal determination that was contrary to . . . clearly established Federal law, as

determined by the Supreme Court." *Id.* at 768. Where a mixed question of law and fact is being

reviewed, "a federal court may grant *habeas* relief only if it determines that the state court decision

rested on 'an unreasonable application of [] clearly established Federal law, as determined by the

Supreme Court of the United States,' to the facts of the case." *Id.* at 768 *(quoting* 28 U.S.C. §

2254(d)(1)). "[A] decision is contrary to clearly established Federal law 'if the state court arrives

at a conclusion opposite to that reached [by the Supreme Court] on a question of law or if the state

---

[1]97 F.3d 751, 767-68 (5th Cir. 1996), *cert. denied*, 520 U.S.1107, 117 S.Ct. 1114, 137 L.Ed.2d
315 (1997), *overruled in part on other grounds, Lindh v. Murphy*, 521U.S. 320, 117 S.Ct. 2059, 138
L.Ed.2d 481 (1997) (*Lindh* effectively overrules the holding in *Drinkard* that the amendments to chapter
153 of Title 28, governing all habeas proceedings, apply to petitions for relief pending on the effective
date of the statute). This application for habeas relief was filed after the effective date of the amendments
to chapter 153 of Title 28.

court decides a case differently than [the] Court has on a set of materially indistinguishable facts.'"

*Knox v. Johnson,* 224 F.3d 470, 476 (5th Cir. 2000) (*quoting Williams v. Taylor,* 529 U.S. 362, 413,

120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)).   A writ may be granted based upon a state court's

unreasonable application of federal law only "if the state court identifies the correct governing

principle . . . but unreasonably applies the principle to the facts of the prisoner's case. " *Id.* "[A]

federal habeas court making the 'unreasonable application' inquiry should ask whether the state

court's application of clearly established federal law was objectively unreasonable." *Williams v.*

*Taylor,* 529 U.S. at 409, 120 S.Ct. at 1521.

BACKGROUND

In petitioner's direct appeal, the Louisiana Supreme Court stated the facts as follows:

> [Rondell] Santinac died in the driveway of 3303 Desire on the night
> of August 22, 1994, at approximately 9:20 or 9:30 p.m., in a hail of
> bullets fired by two men wielding AK-47s from the passenger-side
> windows of a grey Chevrolet Baretta.  The men aimed at a vehicle
> occupied by Santinac and his cousin, Samuel Raeford, who borrowed
> the car that afternoon from his girlfriend, Robbie Malone.  The state's
> case against the defendant [Bernell Juluke], as the driver of the grey
> Baretta, and against [Kuntz] Gable and [Leroy] Nelson as the
> shooters, rested primarily on the eyewitness testimony of Raeford,
> who survived the attack which claimed his cousin's life after a bullet
> struck him in the head.  Raeford knew all three defendants from the
> Iberville Project, where his brother lived, and he had seen them
> together in the project at approximately 6:00 p.m. that night engaged
> in a dispute with Jacob Carter, a close friend of Robbie Malone's
> brother.  Raeford positively identified Gable and Nelson as the
> shooters.  Raeford had also identified the defendant as the driver of
> the Baretta in  a stationhouse lineup conducted less than two hours
> after the shooting.
>
> At trial, however, Raeford admitted that he had not obtained a good
> look at the third man in the car and only assumed that the defendant
> had been at the wheel because he had seen the group earlier that night
> in the Iberville Project and the police had stopped all three men in the

6

grey Baretta near the Iberville Project within 15 minutes of the shooting, after the defendant committed a minor traffic violation. The officer responsible for the stop had pulled behind the vehicle on the  basis of information about the shooting from the police dispatcher and the stop led to the arrests of all three men.  According to the arresting officer, the defendant, also known as Bernell Mays, changed his last name after hearing a follow-up report about the Santinac shooting from the police dispatcher over the patrol unit's radio.  A subsequent search of the vehicle failed, however, to find any physical evidence linking any of the defendants to the shooting.  The officer wrote the citation at 9:45, but made the stop "several minutes earlier," perhaps as early as 9:30 or 9:35 according to several of the defense witnesses on the scene in the project courtyard who saw the flashing lights of the patrol unit as it pulled over the Baretta.

The defendants challenged Raeford's testimony at every turn.  On the scene of the shooting, Raeford described the color of the Baretta to investigating officers as blue.  By stipulation, the state and defense revealed to jurors that in a pre-trial hearing,  Raeford described the car used in the shooting as a turquoise green Baretta, the same make and  color of the vehicle described by two defense witnesses who told jurors they had observed the shooting committed by two unidentified men after their attention had been drawn to the passing car, usually parked in the Desire project, by the loud sound pouring out of its stereo system.  Raeford told one witness that the green Baretta had been outfitted with custom wheels and a "boom bass" stereo system. Russell Spurlock, the owner of the grey Baretta  he had lent the defendant's brother, Izell Henderson, on the day of the offense, informed jurors that his vehicle was a factory model lacking in custom touches.  Other witnesses, including Carter, testified that the three defendants had been locked in a dispute with Carter in the Iberville Project from 8:00 p.m. that night until 9:30 p.m., minutes after the shooting miles away in the Desire Project and within minutes of the stop of Spurlock's Baretta by the police near the Iberville Project.   According to Henderson, he had borrowed Spurlock's Baretta to drive his girlfriend, Daphne Cola, home from work at approximately 9:00 p.m. that night.  When he returned to the project at  9:30 p.m., he found the argument still underway and suggested that the defendant and his companions cool off by taking the car to find something to eat.  To account for the discrepancy in Henderson's testimony and her time card from work which indicated she had punched out at 9:56 p.m. that night, Cola told jurors she had left work early and had another employee cover for her by clocking

7

out both of their cards. Several witnesses, including Robbie Malone, testified that Raeford had made statements after the offense exonerating all three defendants. Malone told jurors that she had seen Carter with a gun in his hand on that night but did not observe him brandish the weapon at any of the defendants. Malone's niece testified that her uncle was a close friend of Carter and that the two men may have used her aunt's car on one or two occasions.

The state speculated at the close of the case that Santinac may have died in Carter's place in the car belonging to his close friend's sister during a shooting meant to avenge a dispute earlier that evening in the Iberville Project. In his closing argument, the defendant's counsel reminded jurors that, unlike the case with Gable and Nelson, Raeford had failed at trial to identify the defendant positively as an occupant of the grey Baretta used in the offense. Counsel left no question, however, that all three defendants had joined in a common alibi defense, which also sought to implicate two unidentified assailants in a turquoise green Baretta with custom wheels and a loud stereo. "We could have rested," counsel reminded jurors, "but we didn't, because there are witnesses who know . . . where Bernell Juluke was." Counsel proceeded to discuss the testimony of those witnesses, including Carter, who placed the three defendants together at the time of the shooting and thereby answered his question, "Where was Bernell Juluke at the time that this murder occurred? Bernell Juluke was in the Iberville Housing Projects fussing with Jacob Carter."

*State v. Juluke*, 725 So.2d at 1292-93.

## SUGGESTIVE IDENTIFICATION

Petitioner contends that his identification by Raeford resulted from police suggestion stemming from a one-on-one viewing of petitioner by the witness and from a police officer advising Raeford that petitioner had been "caught . . . when he got off the interstate and he was with [Nelson and Gable]." Petitioner's Reply to State's Response, p. 17. Juluke asserts that the identification therefore was unreliable and urges that the admission of the unreliable identification deprived him of a fair trial.

The following additional facts are pertinent to this claim. Shortly after police arrived at the

8

scene of the shooting, a police officer transported Raeford to the Homicide Office. After their arrest, petitioner, Nelson, and Gable were also transported to the Homicide Office. Within two hours of the shooting, Raeford viewed each of the suspects, through a one way mirror, while the suspect was alone in a room,[2]. Raeford advised the police that he knew the suspects prior to the shooting. While at the Homicide Office Raeford was told that the suspects had all been together when they were arrested; it is not clear from the record whether Raeford was told this before or after he identified petitioner.

When the procedure used to obtain a witness identification of a perpetrator is unduly suggestive, evidence of an identification is nonetheless properly admitted if "under the 'totality of the circumstances' the identification [is] reliable. . .." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). Even if the state court improperly admits evidence of an unreliable identification, an error properly characterized as "trial error" as opposed to "structural error," a *habeas* petitioner is entitled to relief only if the erroneous admission of the evidence had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); *Wray v. Johnson*, 202 F.3d 515, 525 (2nd Cir. 2000). To put it another way, even if the state court erroneously admits evidence of the identification, a federal *habeas* petitioner is not entitled to relief if that error constitutes "harmless error."

I need not examine whether the state court improperly admitted evidence of Raeford's

---

[2] At the hearing on the motion to suppress, Raeford testified that Juluke, Nelson, and Gable were presented for identification together; however, at trial Raeford testified that the men were viewed individually. In urging that the identification was unduly suggestive, petitioner does not urge that all three suspects were viewed at the same time.

identification of petitioner. Even if the identification evidence was erroneously admitted, petitioner

is not entitled to the relief sought because any such error constitutes only harmless error;  it did not

have a substantial and injurious effect or influence in determining the jury's verdict.

Detectives Wayne Tamborella and Anthony Small testified that at the one-on-one viewing

Raeford identified petitioner as the driver of the vehicle from which Gable and Nelson shot Rondell

Santinac.  Normally such testimony could be reasonably found to have had a substantial and

injurious effect in determining the jury's verdict.  However, any potential for such an effect in this

case was eliminated by Raeford's own admission at trial that he did not see petitioner driving the

vehicle. On direct examination, the prosecutor asked Raeford "how are you so sure that he was in

the car that night?" Raeford responded "because when I saw and I I.D,'d the other two and the man

said he caught him when he got off the interstate and he was with them, so-." At that point

petitioner's counsel objected; the district judge sustained the objection. The prosecutor than asked

Raeford whether he could identify Juluke "at the time of the shooting?" Raeford answered "[n]o,

I can't."    Additionally, the following colloquy occurred during Raeford's cross-examination by

petitioner's counsel:

> Q.  You testified earlier that you did not see Bernell Juluke drive
> whatever color that car was, correct?
>
> A.  Yes, I did.
>
> Q.  So, as far you know, there's nothing connecting him.  Did you see
> him driving the car?
>
> A.  No.

During his closing argument petitioner's counsel reminded the jury that Raeford could not identify

petitioner as an occupant of the vehicle involved in the shooting.    Thus, the jury was fully aware

that the only eyewitness to the crime admitted several times that he had not seen Juluke in the car

at the time of the shooting.  Even if the admission at trial of  the testimony of the detectives that at

the one-on-one viewing  Raeford had identified petitioner as one of the individuals in the car,  was

improper, that testimony could not have had a substantial and injurious effect  considering Raeford's

testimony at trial  that he could not place petitioner at the crime scene.  Moreover, the identification

testimony was not the sole evidence of petitioner's guilt.  This claim lacks merit.

## INSUFFICIENT EVIDENCE

Petitioner urges that there was insufficient evidence to sustain his conviction.   In

determining whether a conviction is supported by sufficient evidence, the relevant inquiry is whether,

viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could

have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-

19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d  560  (1979).  "The *Jackson* inquiry 'does not focus on

whether the trier of fact made the correct guilt or innocence determination, but rather whether it

made a rational decision to convict or acquit.'"  *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir.

2001) (*quoting Herrera v. Collins*, 506 U.S. 390, 402, 113 S.Ct. 853, 861, 122 L.Ed.2d 203 (1993)).

On direct appeal petitioner urged that there was insufficient evidence to sustain his

conviction.  In a detailed opinion the Louisiana Supreme Court held that were was sufficient

evidence to support the conviction.  During the post-conviction challenge to the conviction in state

court, the state district judge granted petitioner an evidentiary hearing at which petitioner introduced

evidence not previously introduced.  Petitioner contended in his state *habeas corpus* proceeding that

such evidence undermined the Louisiana Supreme Court's conclusion that there was sufficient

evidence to support the conviction.  The state trial judge who conducted the post-conviction

11

evidentiary hearing carefully considered this additional evidence and concluded that it could not have affected the jury verdict. Thereafter, both the state appeals court and the Louisiana Supreme Court denied petitioner's application for a writ of *certiorari*.

In considering a state prisoner's motion for *habeas corpus* relief, a federal district court may grant relief on a mixed question of law and fact, such as that involved herein, only if the state court's rejection of the petitioner's claim was based on an unreasonable application of clearly established federal law to the evidence presented in the state court proceeding. *Drinkard v. Johnson*, 97 F.3d at 768, 28 U.S.C. §2254(d)(1).

Viewing the evidence in the light most favorable to the prosecution, the evidence which supports the conviction includes the following facts:

- Petitioner. Gable, and Nelson were together a few hours before the crime;

- Gable  and Nelson were the shooters;

- a third person was the driver;

- the car was a Baretta;

- Petitioner, Gable, and Nelson  were together in a Baretta when, shortly after the shooting, a police officer stopped the vehicle;

- at the time the police officer stopped the Baretta,   the two shooters occupied the same  seats they were in during the shooting, and petitioner was the driver.

Considering that evidence, and the reasonable inferences which can be drawn therefrom, the Louisiana Supreme Court did not unreasonably apply clearly established federal law to the facts of this case in rejecting petitioner's claim.

12

## ABSENCE OF COUNSEL

Petitioner contends that his conviction must be reversed because his counsel was not present during a critical stage of the proceedings, i.e., a portion of the hearing on his motion to suppress his identification. The hearing on the motion to suppress was held on three separate days:  April 7, June 2, and June 30, 1995. The April 7th transcript indicates that Wade Kee assisted Laurence Cohen in representing petitioner that day.  The June 2nd transcript shows that Mr. Kee alone represented petitioner that day.  The transcript of the June 30th hearing  indicates that Joseph Rome represented petitioner.  The transcript also indicates that defendant  Leroy Nelson waived the presence of his counsel that day.   Transcripts of the April 7th and June 2nd hearings identify Mr. Rome as counsel for Leroy Nelson.

Petitioner urges that the transcript of the June 30th hearing incorrectly indicates that Mr. Rome represented him that day; petitioner contends that he was not represented by counsel at that hearing.  The state does not concede that petitioner was unrepresented at that  hearing and urges that even if Juluke was unrepresented, he knowingly and intelligently waived his counsel's presence.[3]

Petitioner has the burden of proving that a constitutional violation has occurred.  *Orman v. Cain*, 228 F.3d 616, 619 (5th Cir. 2000). Thus, petitioner must prove by a preponderance of the evidence  that  he was not represented by counsel during the June 30th hearing. He has failed to do so. The transcript indicates that he was represented by counsel, and petitioner, despite being granted an evidentiary hearing on his application for state post-conviction relief, failed to provide any evidence that he was unrepresented at the June 30th hearing.  Having failed to establish that he was

---

[3] Implicit in this contention is that the transcript mistakenly identifies Nelson rather than petitioner as the individual who waived the presence of counsel.

13

unrepresented at the hearing, petitioner cannot prevail on this claim.

Moreover, even assuming *arguendo* that petitioner was not represented by counsel at the June 30th hearing and did not knowingly and intelligently waive his right to counsel, this claim lacks merit. It is well established that a criminal defendant is entitled to counsel at all critical stages of the criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967). In determining whether a particular stage of a criminal proceeding is "critical," " the Court has looked to whether 'the substantial rights of a defendant may be affected' during that type of proceeding." *Burdine v. Johnson*, 262 F.3d 336, 347 (5th Cir. 2001), quoting *United States v. Taylor*, 933 F.2d 307, 312 (5th Cir. 1991). Because "substantial rights of a defendant may be affected" during a hearing on a motion to suppress an identification, such a hearing is a critical stage of a criminal proceeding.

Petitioner is entitled to relief on this claim only if the state court unreasonably applied "clearly established Federal law, as determined by the Supreme Court" in denying this claim. The state court refused to presume that petitioner was prejudiced by his lack of counsel at the hearing, and instead concluded that the Juluke was not prejudiced by the absence of counsel and therefore was not entitled to relief. The state court did not unreasonably apply clearly established Supreme Court law in reaching that conclusion.

Petitioner relies on *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984) and *Roe v. Flores-Ortega*, 528 U.S. 470, 483, 120 S.Ct. 1029, 1038, 145 L.Ed.2d 985 (2000) in urging that the absence of counsel during the suppression hearing is presumptively prejudicial. In *Cronic* the Supreme Court addressed whether the appellate court properly interpreted the Sixth Amendment in finding counsel ineffective absent a showing of actual

14

ineffectiveness when a young inexperienced attorney was appointed to represent a defendant in a complex, grave criminal proceeding only 25 days prior to trial. In dicta, the Supreme Court stated "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *United States v. Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047. That statement does not mandate the relief sought by petitioner. Here, the absence of counsel occurred not at trial, but rather at a pre-trial proceeding.

Nor does *Flores-Ortega* require granting *habeas* relief. *Flores-Ortega* addressed "the proper framework for evaluating an ineffective assistance of counsel claim, based on counsel's failure to file a notice of appeal without [the defendant's] consent." *Roe v. Flores-Ortega*, 528 U.S. at 473, 120 S.Ct. at 1032-33. *Flores-Ortega* is legally distinguishable. In *Flores-Ortega* "counsel's deficient performance arguably led not to a judicial proceeding of disputed reliability, but rather to the forfeiture of the proceeding itself." *Id.* at 483, 104 S.Ct. at 1038. Counsel's absence from the suppression hearing did not result in a forfeiture of any proceeding. *Flores-Ortega* is inapplicable.

Petitioner cites no Supreme Court authority requiring a presumption of prejudice when counsel is absent from a hearing on a motion to suppress, nor have I found any. Accordingly, the state court properly analyzed this claim by examining whether counsel's absence prejudiced petitioner. Juluke urges that he was prejudiced by his counsel's absence because had he been represented at the suppression hearing his counsel would have learned that Raeford had not seen petitioner in the vehicle at the time of the shooting and therefore would have been able at trial to object to evidence of Raeford's identification of petitioner and would not have relied on the common alibi defense, but instead would have urged that there was a change of drivers between the shooting and the traffic stop.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court concluded that in order to prevail on a claim of ineffective assistance of counsel, a petitioner must prove that his counsel's performance was deficient and that counsel's deficient performance prejudiced the defendant. *Id.* at 694, 104 S.Ct. at 2068.  In order to satisfy the prejudice requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.  It is clear that even "professionally unreasonable" errors on the part of counsel do not warrant setting aside a conviction if the error had no effect on the proceeding. *Larsen v. Maggio*, 736 F.2d 215 (5th Cir. 1984).

The burden of demonstrating prejudice rests on the defendant. *Strickland v. Washington*, 466 U.S. at 693, 104 S.Ct. at 2067.  The defendant must prove that an alleged error actually had an adverse effect on the defense. *Id.*        For  the reasons already stated, the admission of the identification testimony did not  prejudice Juluke.

Petitioner's contention that counsel would have altered his defense strategy had he known Raeford  did not see petitioner in the vehicle is at best speculative.  Raeford's inability to identify Juluke as the driver is not inconsistent with and does not preclude the use of the common alibi defense.  Even absent any identification of petitioner as the driver of the vehicle, sound trial strategy warrants use of the common alibi defense; it is clearly beneficial to petitioner to establish that he was somewhere else at the time of the crime.  Counsel learned that Raeford could not identify him as the driver during the prosecution's case-in-chief.  Therefore, counsel could have abandoned the common alibi defense and pursued the "change of driver" defense had he chosen to do so. Petitioner has failed

16

to satisfy the prejudice prong of the *Strickland* test.

*BRADY* VIOLATIONS

Petitioner asserts that his conviction must be vacated because contrary to *Brady v. Maryland*, 373 U.S. 83, 87,  83 S.Ct. 1194, 1196-97,  10 L.Ed.2d 215 (1963) the state failed to provide petitioner with a copy of the "Incident Report", i.e., the initial police report,  as well as the computer dispatch logs, which contain exculpatory and impeachment evidence.  Additionally, petitioner contends that "the prosecution's suppression of Mr. Raeford's inability to identify Mr. Juluke as the driver is also a constitutional violation."

The Due Process Clause of the Constitution requires the prosecution to disclose to the defense any material exculpatory information.  *Id.*  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).   A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*  The Supreme Court has noted, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). The state is also obligated to disclose material evidence  affecting credibility.  *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766,  31 L.Ed.2d 104 (1972).

Petitioner contends that the Incident Report exculpates him  and could have been used to impeach Raeford  because it identifies the perpetrators as "unknown."  Officers Len Davis and Sammy Williams were the first officers to arrive at the scene of the shooting; one of them  prepared

17

an "Incident Report."[4]

It is not clear from the record whether petitioner's counsel had a copy of the initial police report. The record establishes that Clyde Merritt, counsel for one of the defendants, had a copy of the Incident Report at the April 7, 1995 hearing on pretrial motions.[5] At that same hearing petitioner's counsel stated that the state had not yet responded to his request for discovery. The judge advised the prosecutor to "[g]et with them and see what they need and what they are entitled to." At the trial, during the cross- examination of Detective Tamborella, Mr. Merritt, after learning that Lynn Davis or Sammy Williams had provided Detective Tamborella with the incident report, asked the judge for permission to see "part of what is called the incident report." The prosecutor advised the judge that Mr. Merritt was "asking for production of reports and we've turned all of these reports over." Petitioner's counsel did not indicate that he did not have a copy of the incident report. Moreover, petitioner produced no evidence at the evidentiary hearing on his petition for state post-conviction relief that the state had not disclosed the Incident Report to him nor has he produced any such evidence in this matter. Juluke has the burden of establishing that the state failed to produce the Incident Report. *See Orman v. Cain*, 228 F.3d at 619. Petitioner has failed to carry that burden.

Alternatively, even if petitioner has established that the state failed to provide him with the Incident Report, the claim lacks merit. At trial, in response to questioning by the prosecutor and on

---

[4] Neither the record nor the Incident Report itself reveals which officer authored the report.

[5] During his cross-examination of Dwight Deal, the detective who conducted the identifications of petitioner and his co-defendants, Mr. Merritt questioned Deal about whether the initial incident report indicated that Raeford did not know the perpetrators of the crime. When Deal responded that he didn't "recall that being in there," Mr. Merritt stated "[t]hat's on page 2 of the police incident report."

cross-examination, Raeford admitted that he was unable to identify petitioner as the driver of the car involved in the shooting. The exculpatory or impeachment value of the Incident Report is minimal at best.

Regarding the dispatch logs, it is undisputed that they were not produced until after petitioner was convicted. The New Orleans Police Department has a computer-aided dispatch system which records information received by complaint operators from individuals who call the police as well as information received by complaint dispatchers who maintain radio contract with police officers in the field. The computer system generates a printed version of the complaint history. The complaint history is a chronology of information related to a particular call for police assistance, which is entered into the computer by the complaint operators and dispatch operators as they receive the information. The system records, in military time, the time the information was inputted into the computer. Logs of this information are maintained by the New Orleans Police Department. Two different logs contain information relevant to this claim.

One log, reveals the following relevant information:

- 21:22:08 - police headquarters received the initial call about shots being fired at the Desire Project;

- 21:22:30 - the first police car is dispatched to the scene of the shooting;

- 21:24:41 - Unit 518[6] arrives on the scene;

- 21:27 - complaint dispatcher receives a dispatch from Unit 518 indicating that "Perps Pernell Maze Bunch of Gold in his mouth";

- 21:30 - another transmission from Unit 518 is recorded as

---

[6] Officers Len Davis and Sammy Williams were assigned to Unit 518.

" B/M,, Pernell Maze,, mouth of golds in Blu 4-dr Chevy Beretta
(- perp) of 34S";[7]

- 22:20  - Assistance by Unit 103

A second dispatch log related to the same complaint includes the following relevant information:

- 21:45  - Police Unit 103 sent a "10-28" signal, i.e., a request for emergency radio clearance indicating  involvement in a chase;  Unit 103 was located at Derbigny and North Prieur

- 21:47 - Unit 103 relocated to Bienville and North Derbigny

The following additional facts are relevant in analyzing this claim.  Officer Tommy Felix, who was assigned to Unit 103, executed the traffic stop of the car driven by Bernell Juluke in which Gable and Nelson were passengers.  At trial, Officer Felix testified that once he stopped the vehicle, the driver got out of the vehicle,  and that after the driver stated his name, they heard, over the police unit radio, the police dispatcher state the same name  that the driver had just given Officer Felix. Officer Felix testified that he then asked  the driver his name again and then the driver changed his name.

Petitioner asserts that the dispatch logs could have been used to impeach Officer Felix because they demonstrate that the identity of the driver was not broadcast by the police dispatcher during the time that Officer Felix questioned petitioner.  Additionally, petitioner urges that the logs are exculpatory and could have been used to impeach  the testimony of Detective Tamborella and Officer Felix  because they establish that 23 minutes, rather than the 10 - 15 minutes testified to by Detective Tamborella, and relied upon by the Louisiana Supreme Court in affirming petitioner's

---

[7] "34S" is a "signal" for an aggravated battery by shooting.

conviction,  elapsed between the initial call to police about the shooting and Officer Felix's sighting of the vehicle driven by petitioner.

In rejecting this claim, the state court concluded that "[p]etitioner has failed to establish that the state was in possession of alleged <u>Brady</u> material or that the state even had knowledge of its existence." However, despite that finding, the court went on to conclude that the "information does not rise to the level of Brady."  That conclusion is not an unreasonable application of clearly established federal law to the facts involved herein.  The information in the dispatch logs,  even considered together with the Incident Report,  is not such that  there is a reasonable probability that the result of the proceeding would have been different.   The jury heard extensive evidence of a common alibi for all three defendants.  The jury, as it was entitled to do, chose not to credit the witnesses who provided evidence supporting the alibi defense. The time factor is not relevant to the common alibi defense.

Petitioner also urges that his conviction must be dismissed because the state failed to disclose that Raeford was unable to identity petitioner.  Petitioner has not pointed to any facts which establish that the prosecutor knew or should have known that Raeford could not identify the driver of the vehicle.  Juluke's contention that  the state's failure to inform the jury in opening argument that petitioner was the driver of the car involved in the shooting and that his co-defendants were the shooters "suggests" that the state knew that Raeford could not identify petitioner as the driver is not persuasive.

VIOLATION OF THE CONFRONTATION CLAUSE

The Sixth Amendment provides in pertinent part that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Petitioner asserts

21

that during the trial the admission of hearsay testimony violated his constitutional right to confront

the witnesses against him. Specifically, Juluke urges that the admission of Officer Felix's testimony

that he heard a police broadcast containing petitioner's name violated his right to cross-examine

witnesses against him because the prosecution did not call as witnesses Officer Len Davis and

Sammy Williams, the officers who put out the broadcast. The transcript reveals the following

colloquy during the prosecution's direct examination of Officer Felix:

> Q: When you were speaking with Mr. Juluke with regard to whether or not he had a driver's license and the like, did anything unusual occur during that conversation?
>
> A. The only thing that occurred during the conversation was that, once he gave his name – I forgot to turn my radio mike down and the dispatcher gave his name across the air and I said –

Mr. Kee:

> Your Honor, again he is testifying as to what somebody else said.

[Prosecutor]:

> Your Honor, that isn't introduced for the purpose of the truth of of the matter asserted, but I would ask that the next part of the question as to what happened as a result of the defendant herein [sic] that transmission.

The Court:

> I sustain the objection. Do not testify as to what you heard from the dispatcher. Just tell us what you did after receiving that communication what happened.

The Witness:

> Okay.

Examination by [Prosecutor]

Q.  After you did receive that communication, what did you do as a result of that?

A.  I asked him his name again.

Q.  Did he give you the same name he had given you before or did he give you a different –

Mr. Kee:

Your Honor, again he's testifying as to –

The Court:

I agree,  That's too leading.  Sustained.  Sustained.
Tell us in detail without any question what occurred then.

Ladies and gentlemen of the jury, I want you to disregard any testimony as to what was heard over a dispatcher, anything like that is not admissible evidence.

Tell us after you heard the dispatch as to what you did.  You can also, of course, tell us what the defendant, any one of them said.

Go ahead.

The Witness:

He changed his name and he gave me the correct first name.
And I said, "Man, for a minute you scared me."  And then
the First District showed up with the Fifth District.

In rejecting this claim on direct appeal, the state court concluded that Officer Felix's testimony concerning the name broadcast over the police radio did not constitute hearsay testimony because it was not admitted for the truth of the matter, i.e. that petitioner in fact was the perpetrator of the crime, but rather was admitted to show "the situation in which the change of names occurred."

As the transcript reveals, the testimony concerning the broadcast was not offered to establish

that petitioner was the perpetrator, but rather was offered for another purpose.  Thus, it is not hearsay.  More importantly, the trial judge instructed the jury to disregard the testimony concerning what was heard as a result of the radio dispatch.  A jury is presumed to follow instructions.  *See United States v. Hefferon*, 314 F.3d 211, 222 (5th Cir. 2002), citing *Zafiro v. United States*, 506 U.S. 534, 540-41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993).  There is no reason to assume that the jury in this case did not follow the judge's instruction to disregard testimony concerning what was heard in the radio dispatch.

Alternatively, even if the testimony constituted inadmissible hearsay, petitioner is not entitled to relief.  "The wrongful admission of hearsay evidence violates the Confrontation Clause only when the evidence was a 'crucial, critical or highly significant factor in the framework of the whole trial.'"  *Gochicoa v. Johnson,* 118 F.3d 440, 446 (5th Cir. 1997), *quoting Cupit v. Whitley*, 28 F.3d 532, 537 (5th Cir. 1994).   In determining whether the evidence was a "crucial, critical or highly significant factor in the framework of the whole trial" the following factors are considered:

- whether the hearsay evidence was "crucial" or "devastating";

- whether prosecutors misused a confession or otherwise engaged in misconduct;

- whether a joint trial or the wholesale denial of cross-examination was was involved;

- whether the most important prosecution witness, as well as other prosecution witnesses, was available for cross-examination; and

- the degree to which the hearsay evidence is supported by indicia of reliability.

*Id.*

The  determination  of  whether  the  evidence  is  "crucial"  or

24

> "devastating," . . . recognizes that the erroneous admission of unreliable hearsay may nonetheless be harmless in light of other evidence at trial; by examining whether hearsay was "crucial" or "devastating," the court seeks to determine whether the impermissible hearsay evidence was sufficiently damaging to the defense to warrant reversal.

*Gochicoa v. Johnson*, 118 F.3d at 447.

Several of the cited factors weigh heavily in favor of concluding that when the admission of the testimony is viewed in the context of the whole trial, the admission did not violate the Confrontation Clause. The testimony about the radio broadcast was not crucial to the prosecution nor was it devastating to the defense in the context of the trial as a whole. The broadcast of petitioner's name over the police radio was not the sole evidence linking petitioner to the crime. Additionally, the testimony about the broadcast came after the eye witness testified that he could not identify the driver of the car. Other factors also weigh in favor of concluding that the admission of the hearsay did not violate the Confrontation Clause. The prosecution did not engage in misconduct. It is also significant that Raeford, indisputably the most important prosecution witness, was available for cross-examination and was subjected to vigorous cross-examination, as were other prosecution witnesses. Petitioner is not entitled to the relief sought.

New Orleans, Louisiana, this 26th day of January 2004.

_____
UNITED STATES DISTRICT JUDGE